UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff-Appellee,

v.

W&O, INC., d.b.a. Rustic Inn, Defendant-Appellant.

Nos. 98-5515, 98-5646.

United States Court of Appeals,

Eleventh Circuit.

May 30, 2000.

Appeals from the United States District Court for the Southern District of Florida.(No. 95-06138-CV-JAG), Jose A. Gonzalez, Jr., Judge.

Before BIRCH and MARCUS, Circuit Judges, and ALAIMO[*], Senior District Judge.

BIRCH, Circuit Judge:

Before this court are two consolidated appeals arising from the Pregnancy Discrimination Act case brought by Plaintiff-Appellee United States Equal Employment Opportunity Commission ("EEOC") on behalf of a class of employees of Defendant-Appellant W&O, Inc., doing business as Rustic Inn ("W&O"). In the first appeal, No. 98-5515, W&O appeals the jury award of punitive damages to the employees and the district court's award of front pay to Barbara Nuesse ("Nuesse"), one of the employees. In the second appeal, No. 98-5646, W&O appeals the district court's order awarding costs to the EEOC. As to W&O's appeal of the damage awards, we AFFIRM the award of punitive damages and VACATE the award of front pay and REMAND for the district court to make factual findings as to whether reinstatement is feasible. As to the appeal of the award of costs, we AFFIRM the award of witness fees, deposition costs, and photocopying costs, VACATE the award of exhibit costs and process server fees, and REMAND for re-evaluation of the process server fees request

*I. Factual Background*

---

[*]Honorable Anthony A. Alaimo, Senior U.S. District Judge for the Southern District of Georgia, sitting by designation.

When this case was filed, W&O had a written policy of barring pregnant waitresses from waiting tables at the Rustic Inn past their fifth month of pregnancy and requiring them, instead, either to suspend working at the Rustic Inn or to work in the positions of cashier or hostess. Because they do not receive gratuities from customers, the cashier and hostess positions pay less than does the waitress position. In its complaint, the EEOC challenged the policy as violating the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). The EEOC represented a class of three aggrieved employees: Nuesse, Suzette McDevitt ("McDevitt"), and Debbie Grossman ("Grossman"), each of whom was removed from the schedule, had her hours reduced, or left after being told that the policy would be applied to her.

At summary judgment, the district court found that W&O's policy violated the PDA; W&O does not appeal that determination. The district court scheduled a jury trial on the issue of damages. In the pretrial stipulation, adopted by the district court as the final pretrial order, the parties included calculations of damages for the three employees; the calculations included back pay, interest on the back pay, and punitive damages but did not address front pay. The pretrial stipulation mentions front pay and reinstatement only in the undisputed statements of law. At trial, in addition to offering evidence regarding the aggrieved employees' back pay claims and W&O's financial situation, the parties offered testimony about the origin and application of the pregnancy policy, the job of waitress at the Rustic Inn, and the specific treatment of each of the aggrieved employees.

*The pregnancy policy:* Michael Diascro ("Diascro"), the Rustic Inn's general manager, drafted the policy at the approximate time that the Family and Medical Leave Act ("FMLA") was enacted. He viewed the policy, which stated, among other things, that a server should not work past five months of pregnancy, as a guideline. In drafting the policy, Diascro did some research, including calling "Wage and Labor" and looking at reference books and other restaurants' handbooks. James Donlin ("Donlin"), night manager for the Rustic Inn, testified that he called the Labor Board in 1992 and was advised that pregnant women should be able to keep their jobs for as long as they were able to fulfill their duties. Donlin admitted that a pregnant

2

woman who did not take a cashier or hostess position would have to leave the Rustic Inn after her fifth month of pregnancy. He suggested that the policy came about because "some of the managers and owners are older, were from the old school." R7-173-168. Donlin stated that the owner Henry Oreal ("H.Oreal") and his sons Wayne ("W.Oreal") and Gary ("G.Oreal") all made comments indicating that they were from the "old school" and believed that a pregnant woman who was showing should not wait tables. In an EEOC affidavit, H. Oreal stated that "no one is going to run around here pregnant and big like that. No pregnant women are going to tell me how long they'll stay." R8-174-323. W. Oreal stated that "[t]here's a very bad aura going around the place because of this particular case here...." R7-173-192-93. The policy was removed once found to be illegal. The new policy is "almost identical" to the FMLA regulations. Diascro admitted that he could have originally modeled the policy on the FMLA regulations but did not.

*The job:* A waitress at the Rustic Inn had to handle multiple tables at one time. She had to carry trays loaded with food, though anyone (pregnant or otherwise) could get help carrying trays weighing more than 25 pounds. The restaurant was split into four different stations, with the outside canal area being the most desirable due to the large number of people who liked to sit there. The inner areas closer to the kitchen earned less money in tips. The area closest to the kitchen was the area where Rustic Inn "normally put pregnant waitresses." R8-174-330.

*Nuesse:* Nuesse testified that she gave W&O a note from her doctor stating that she could work, but that, around the time of her sixth month, H. Oreal told her that she was "too fat to be working in here" and that he didn't want her serving his customers being as "fat" as she was. R7-173-39. A few days later, H. Oreal called Nuesse into a meeting with the other owner, Wayne McDonald ("McDonald") and W&O's bookkeeper. At this meeting, H. Oreal told her that he wanted her to stop waiting tables because she was "too big" and that she could work as a cashier or hostess. R7-173-40. H. Oreal testified that he did not think that the doctor's note should affect the decision because the doctor would not know how hard the work was. Nuesse was removed from the schedule during her seventh month. After Nuesse gave birth, she was not

3

contacted to be put back on the schedule. Nuesse testified that she was told by Allen Brenner ("Brenner"), a manager of the Rustic Inn, that it was not "a good idea I show my face around there." R7-173-46. Nuesse could not find a job waiting tables and now works for United Postal Service.

H. Oreal alleged that customers complained to him about the fact that Nuesse was working while obviously pregnant, that he was worried that she would drop a tray while running and hurt the fetus or someone else, and that Nuesse was not doing her work properly. R8-174-310-11, 314.[1] H. Oreal wanted her to switch to being a cashier but Nuesse "wanted to work when she wanted to work, and do what she wanted to do, and disregarded my problem...." R8-174-313. Nuesse admitted that H. Oreal told her she could "always have [her] job back." R7-173-55. H. Oreal testified that he liked Nuesse "as a person, as an employee ... [u]ntil this thing happened." R8-174-310. H. Oreal testified that Nuesse could return to the Rustic Inn even though "it cost [him] a ton of money." R8-174-314.

*McDevitt:* McDevitt explained that it was common knowledge at the Rustic Inn that pregnant women could work through their fifth month. At some point, McDevitt was given a handbook with the pregnancy policy in it. When McDevitt was four or five months pregnant with her first child, the head waitress told her that she would no longer be scheduled after that week; McDevitt went to Diascro and Donlin and told them that she needed to keep working. Diascro said that she could keep working as long as she wrote on the schedule that she would start pregnancy leave by a specified day, approximately two weeks later. McDevitt wanted to keep working but was required to stop working during her fifth month of pregnancy. After the birth of her first child, McDevitt returned to the Rustic Inn. During McDevitt's second pregnancy, she objected during a meeting when Diascro asserted that no one had been forced to stop working due to pregnancy. McDevitt testifies that she was retaliated against after that meeting. McDevitt left during her fifth month of the second pregnancy of her own choice because of child care issues. McDevitt states that there

---

[1]Even when not pregnant, Nuesse always ran and moved quickly.

4

were no complaints about her work while pregnant, while Diascro asserts that McDevitt refused to work in a particular area during her second pregnancy.

*Grossman:* Grossman was working full-time when she became pregnant. Her husband was terminated from his job the day after she found out that she was pregnant. A couple of months into the pregnancy, Grossman had some spotting. She took the rest of the day off and visited the doctor, who told her that it was only a broken blood vessel and had nothing to do with the baby. He suggested that she take it easy for a few days; the head waitress told her to take the rest of the week off. Grossman called the head waitress later in the week to learn about the schedule and was told that management did not want her on the schedule. Grossman got upset and started to cry; the head waitress told her that she needed to talk to Diascro. Diascro told her that she couldn't work and that she was "not thinking right" because she was pregnant. R7-173-201. Grossman convinced Diascro to give her some shifts, but he gave her fewer shifts than she had previously worked and intentionally gave her slower nights when she would have fewer customers. He also limited her to working in the dining room. To try to make up for the lost income caused by getting fewer and less desirable shifts, Grossman began working part-time at another restaurant, Chuck's Steakhouse. Grossman ultimately went full-time at Chuck's but made less money there; she worked there into her ninth month of pregnancy. It is undisputed that Grossman was a good waitress and that she was able to fulfill her duties while pregnant.

W&O moved for judgment as a matter of law on the issue of punitive damages after the EEOC rested its case and after the close of evidence; the district court denied the motions. The jury found W&O liable for $26,231.43 in back pay and $350,000.00 in punitive damages as to Nuesse, for $3,800.24 in back pay and $200,000.00 in punitive damages as to McDevitt, and for $6,225.46 in back pay and $200,000.00 in punitive damages as to Grossman. After the trial, the EEOC moved for judgment as a matter of law on the damage claims, for entry of judgment on the issues of back pay and punitive damages, subject to the statutory cap of $100,000 per employee, and for injunctive relief, including front pay for Nuesse in the amount of $924.27

5

every three months for three years. W&O objected, arguing (among other things) that front pay was inappropriate because the pretrial stipulation included no front pay calculations and because reinstatement of Nuesse was viable and that punitive damages were inappropriate due to lack of evidence of malice, excessiveness, and the statutory cap. The district court entered final judgment as requested by the EEOC. Specifically, the court ordered that W&O pay the full amount of back pay stated in the jury verdict and $100,000.00 in punitive damages to each employee and that W&O pay Nuesse the requested front pay. W&O filed a renewed motion for judgment as a matter of law or, alternatively, a new trial and a motion to set aside the damage award or for remittur. The motions challenged the award of punitive damages on the grounds that there was insufficient evidence to justify punitive damages, that the awards were excessive, and that the statutory cap should limit the total punitive damages to $100,000. W&O also filed a motion to alter or amend the judgment; this motion challenged the punitive damages and the award of front pay. The district court denied the post-judgment motions. W&O appealed the awards of punitive damages and of front pay to Nuesse.

The EEOC filed a motion to tax costs pursuant to 28 U.S.C. § 1920 and Fed.R.Civ.P. 54(d). The EEOC requested witness fees for Nuesse, McDevitt, and Grossman, including two days' court appearance fees and mileage and parking costs for each, totaling $323.68. The EEOC also requested costs incidental to the taking of the depositions of W. Oreal, Donlin, McDonald, Lisa Melrone ("Melrone"), H. Oreal, Dorothy O'Shea ("O'Shea"), Barrington Smith ("Smith"), Kim Tatarka ("Tatarka"), Lori Zobel/Vallancourt ("Zobel"), Dr. Albert Pesticelli ("Pescitelli"), Regina McBride ("McBride"), Dorothy Raguse ("Raguse"), Micki DiClemente ("DiClemente"), Brenner, Nuesse, Grossman, McDevitt, and W&O as corporation, for a total amount of $4,648.44. The EEOC also requested reimbursement of the costs of using a private process server, of trial exhibits, and of costs of copying discovery documents provided by W&O, for a total amount of $1,703.25.

6

W&O challenged the requested costs. As to the witness fees, W&O argued that the EEOC should receive only $160.00 (two days' appearance fees for Grossman and one day's appearance fees for Nuesse and for McDevitt with no mileage or parking fees). In challenging the witness fees, W&O never argued that witness fees were inappropriate on the ground that the employees were parties to the action. W&O also contended that each of the depositions covered by the EEOC's costs request was unnecessary. Finally, W&O challenged the request for reimbursement for use of the process server, exemplification of trial exhibits, and photocopying as contrary to § 1920 and as unnecessary to the litigation.

In its order on costs, the district court noted that parties are generally not awarded witness fees and that, in its view, the three aggrieved employees "stand in the same position as parties to the suit." R6-187-2. Because W&O had not challenged the witness fees for the employees on the ground that they were parties to the case, the district court awarded witness fees to the EEOC but reduced the requested witness fees to $160.00, as W&O had argued. Except for reducing the EEOC's requested costs for exemplification to reflect the fact that the EEOC had only used at trial three of the seven exhibits at issue in the costs request, the district court rejected all of W&O's arguments as to process server fees, exemplification, and photocopying. W&O timely appealed the award of costs.[2]

## II. Appeal No. 98-5515

W&O's challenge to the sufficiency of evidence as to punitive damages is governed by Fed. R. Civ. Proc. 50. We review *de novo* the denial of W&O's renewed motion for judgment as a matter of law on the issue of punitive damages. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1526 (11th Cir.1997). Applying the same standards as the district court, we "consider 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a

---

[2]The EEOC also requested as miscellaneous costs the expense of travel and lodging for EEOC attorneys and the costs of court-ordered mediation. These miscellaneous costs were denied by the district court and are not at issue in this appeal. The EEOC also has not appealed the district court's decision to reduce its requested witness fees and exemplification costs.

7

matter of law.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)). We must " 'consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party.' " *Id.* (quoting *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)).

W&O's challenges to the amount of punitive damages and the award of front pay is governed by Fed. R. Civ. Proc. 59(e). We "will not overturn a denial of a Rule 59 motion absent an abuse of discretion." *Mays v. United States Postal Serv.,* 122 F.3d 43, 46 (11th Cir.1997). "[W]e review the award of damages in a Title VII case for an abuse of discretion." *Virgo v. Riviera Beach Assocs.,* 30 F.3d 1350, 1363 (11th Cir.1994). We review *de novo* all underlying questions of law. *See Bechtel Const. Co. v. Secretary of Labor,* 50 F.3d 926, 931 (11th Cir.1995).

*A.       Punitive Damages*

W&O challenges the award of punitive damages on the grounds that there is insufficient evidence to justify punitive damages, that the punitive damages award is excessive, and that the district court misapplied the statutory cap in 42 U.S.C. § 1981a.[3] We address the sufficiency of the evidence and statutory cap issues first.

*1.       Malice or Reckless Indifference*

W&O argues that the EEOC presented insufficient evidence to justify punitive damages. Specifically, it argues that its motive, *i.e.,* to protect pregnant women and their unborn children, was benevolent and premised in the belief that it was not right for an overtly pregnant woman to wait tables and carry heavy trays.

---

[3]W&O initially also challenged the district court's jury instruction on punitive damages but conceded at oral argument that the instruction was correct in light of the Supreme Court's decision in *Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999), which was issued after briefing closed in this case but before we held oral argument.

Until Congress passed the Civil Rights Act of 1991, punitive damages were unavailable under Title VII. *See Kolstad v. American Dental Ass'n,* 527 U.S. 526, 119 S.Ct. 2118, 2123-24, 144 L.Ed.2d 494 (1999). As part of the 1991 enactments, Congress added a provision permitting Title VII plaintiffs to recover compensatory and punitive damages where the defendant "engaged in unlawful intentional discrimination" prohibited by Title VII. 42 U.S.C. § 1981a(a)(1). Congress included a standard as to when punitive damages would be permissible:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1981a(b)(1). The Supreme Court interprets § 1981a(b)(1) to mean precisely what its plain language says, namely, that punitive damages are appropriate if, and only if, the employer acts with "malice" or "reckless indifference," such that the "employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Kolstad,* 119 S.Ct. at 2125. In *Kolstad,* the Supreme Court expressly rejected the idea "that eligibility for punitive damages can only be described in terms of an employer's 'egregious' misconduct." *Id.* at 2124. In short, "[w]hile egregious misconduct is evidence of the requisite mental state, § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind." *Id.* (citations omitted). Thus, to the extent that W&O's argument depends solely on the fact that its management acted out of the desire to benefit the pregnant women in its employ, it is clear that its managers' and owners' alleged lack of ill will is not sufficient, in and of itself, to bar punitive damages.

Rather, the award of punitive damages is valid if W&O acted with malice *or* reckless indifference to the civil rights of its pregnant employees. "Malice means 'an intent to harm' and recklessness means 'serious disregard for the consequences of [one's] actions.'" *Ferrill v. Parker Group, Inc.,* 168 F.3d 468, 476 (11th Cir.1999) (quoting *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 491 (11th Cir.1996)) (alteration in original). A jury may find reckless indifference where the employer does not admit that it knew that its actions were

9

wrong. *See Merriweather v. Family Dollar Stores of Indiana, Inc.,* 103 F.3d 576, 582 (7th Cir.1996). However, mere negligence as to the civil rights of employees is not enough to justify punitive damages. *See EEOC v. Wal-Mart Stores Inc.,* 156 F.3d 989, 992 (9th Cir.1998).

We conclude that there was sufficient evidence for the jury to find that W&O acted with reckless indifference to the civil rights of its pregnant employees. Donlin was told by the Labor Board that W&O must permit pregnant women to keep their jobs as long as they could fulfill their duties. Diascro researched the proposed policy, including calling Wage and Labor, and, while he could have used the FMLA regulations as the model for W&O's pregnancy policy, instead chose to draft this policy. Comments from various managers, including H. Oreal's statement that "no one is going to run around here pregnant and big like that [and n]o pregnant women are going to tell me how long they'll stay," R8-174-323, could be interpreted as showing an unwillingness to accede to the law. The jury would be entitled to find that W&O maintained the policy in the face of challenges until it was affirmatively found that it was illegal. Finally, while Diascro claimed that the five month benchmark in the policy was only a guideline, Donlin's testimony, as well as the experience of the three women in this case, belied that claim. If the jury chose to believe Nuesse, McDevitt, and Grossman, then the jury would be entitled to find that their employment was ended solely because of pregnancy and that each of the three women was capable of fulfilling her job duties. This evidence is sufficient, when considered with the evidence tending to show that Donlin and Diascro knew that pregnancy discrimination violated federal law, to justify a finding of reckless indifference. *See Kim v. Nash Finch Co.,* 123 F.3d 1046, 1066 (8th Cir.1997) (affirming grant of punitive damages where "[t]here was evidence that [the defendant] knew what constituted unlawful employment practices" and where the disparate treatment was engaged in by supervisors or management).[4]

_____

[4]This case is distinguishable from *Deneen v. Northwest Airlines, Inc.,* where the Eighth Circuit held that punitive damages were inappropriate in a pregnancy discrimination case where the defendant "believed the contract required it to consider [the plaintiff's] pregnancy-related condition and ensure her fitness for duty before allowing her to return from layoff status" and where the defendant "was concerned about the health of [the plaintiff] and her baby." 132 F.3d 431, 439 (8th Cir.1998). No contract requires

10

*2.      Statutory Cap*

W&O argues that the district court erred in applying the statutory cap found in 42 U.S.C. § 1981a(b)(3). The statutory cap is a sliding scale of limitations on compensatory and punitive damages based upon the size of the employer, with the smallest covered employers being liable for up to $50,000 and the largest covered employers for up to $300,000 for each complaining party. *See* §§ 1981a(b)(3)(A)-(D). The statutory cap for W&O is found in § 1981a(b)(3)(B), which states:

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—
>
> ...
>
> (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000....

It is undisputed that the $100,000 cap found in § 1981a(b)(3)(B) is the appropriate limitation to be applied to W&O based on its employment patterns. W&O argues, however, that the district court erred in finding that Nuesse, McDevitt, and Grossman were each entitled to receive a full $100,000 in punitive damages. In making this argument, W&O focuses on the term "complaining party," which, as used in § 1981a, is defined as "the Equal Employment Opportunity Commission, the Attorney General, or a person who may bring an action or proceeding under title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.)." 42 U.S.C. § 1981a(d)(1)(A). W&O argues that the EEOC is the only complaining party and that the three employees, who are not plaintiffs, are limited to splitting $100,000. The EEOC, however, argues that each of the employees, like members of a class certified under Fed.R.Civ.P. 23, is eligible for $100,000 apiece. This question of statutory interpretation is an issue of first impression in the courts of appeals.

We find that each aggrieved employee represented by the EEOC in a Title VII action may receive up to the full amount permitted by the applicable statutory cap. We begin, as we must, "with the language

W&O to consider its servers' pregnancy in permitting them to work.

11

of the statute itself." *United States v. Ron Pair Enterprises,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). "[T]he plain meaning of the statute controls unless the language is ambiguous or leads to absurd results." *United States v. McLymont,* 45 F.3d 400, 401 (11th Cir.1995). Here, the language does not clearly support W&O's reading, for "complaining party" is not limited to a person who *has* brought a Title VII action or proceeding but instead is defined as an agency or "a person who *may* bring an action or proceeding under title VII." § 1981a(d)(1)(A) (emphasis added). Aggrieved employees "may" bring an action or proceeding under Title VII. Thus, while the term "complaining party" includes the EEOC, the statutory language supports the conclusion that an aggrieved party whose interests are represented by the EEOC may receive up to the full amount of the statutory cap.

Our conclusion is bolstered by the EEOC's interpretation of § 1981a:

When the Commission, or an individual, is pursuing a claim on behalf of more than one person, the damage caps are to be applied to each aggrieved individual. For example, where the Commission files suit on behalf of ten complaining parties, against an employer who has 1000 employees, each complaining party may receive (to the extent appropriate) up to $300,000. The respondent's total liability for all ten complaining parties may be up to $3,000,000.

"Enforcement Guidance: Compensatory and Punitive Damages Available under § 102 of the Civil Rights Act of 1991," *EEOC Compl. Man.* (BNA) ¶ N:6071, 6075-76 (July 1992). "[I]t is axiomatic that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards. Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference." *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988). We conclude that the EEOC's interpretation of the statutory cap is reasonable. The statute's language is consistent with the EEOC's interpretation.

The legislative history of § 1981a likewise supports the EEOC's interpretation. *See* 137 Cong. Rec. S15445-02, S15471 (October 30, 1991) (statement of Sen. Kennedy) (discussing addition of words "for each complaining party" to the statutory cap provisions and stating: "The amount of damages that a victim can recover should not depend on whether that victim files her own lawsuit or joins with other similarly situated

12

victims in a single case. Rather, the amount of damages should depend on the injury the victim has suffered, subject to the caps. This amendment ensures that the remedy provided ... is available to each individual who has been subjected to abuse."); *see also Burlington Northern R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 461, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987) ("Legislative history can be a legitimate guide to a statutory purpose obscured by ambiguity."). Thus, as the Seventh Circuit noted, "[t]he language in question well serves the end of permitting each class member to receive compensatory damages up to the single-party limit." *Smith v. Chicago Sch. Reform Bd. of Trustees,* 165 F.3d 1142, 1150 (7th Cir.1999). However, the class certification requirements of "Rule 23[are] not applicable to an enforcement action brought by the EEOC in its own name and pursuant to its authority under § 706 [42 U.S.C. § 2000e-5(f)(1) ] to prevent unlawful employment practices." *General Tel. Co. of the Northwest v. EEOC,* 446 U.S. 318, 323, 100 S.Ct. 1698, 1703, 64 L.Ed.2d 319 (1980). Thus, reading § 1981a to permit recovery up to the statutory cap for each aggrieved party represented by the EEOC achieves the goal of full compensation for aggrieved employees without adding procedural requirements. *See EEOC Compl. Man.* at ¶ N:6076 n. 8 (stating that alternative interpretation of § 1981a would be "unwieldy, if not unworkable"); *see also EEOC v. Moser Foods, Inc.,* No. Civ. 94-2516 PHX EHC (D.Ariz. Nov. 7, 1997) (finding that EEOC interpretation of § 1981a is reasonable and that "[i]t makes little sense to authorize the EEOC to bring a single suit on the claims of multiple employees against their employer if doing so reduces the damages that can be obtained.").

We find that each aggrieved employee represented by the EEOC in a Title VII action may receive up to the statutory cap without filing a separate suit or intervening in the EEOC's suit. Accordingly, the district court did not err in finding that the employees could each receive up to $100,000 in punitive damages.

*3.       Excessiveness*

Finally, W&O argues that the punitive damages awarded, even after reduction pursuant to the statutory cap, is excessive. In *BMW of N. Amer., Inc. v. Gore,* the Supreme Court analyzed three "guideposts" in deciding whether a punitive damages award was unconstitutionally excessive. 517 U.S. 559, 574, 116

13

S.Ct. 1589, 1598, 134 L.Ed.2d 809 (1996). The *BMW* guideposts include: (1) the "degree of reprehensibility" of the wrongdoing; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and [her] punitive damages award"; and (3) "the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575, 116 S.Ct. at 1598-99. In applying the *BMW* guideposts, courts should also consider whether the amount of punitive damages serves the interests of deterrence. *Id.* at 584, 116 S.Ct. at 1603. While *BMW* addressed the constitutionality of punitive damage awards, it is "instructive" to courts considering the amount of punitive damages awarded in employment discrimination cases. *Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 943 (5th Cir.1996); *see also Deters v. Equifax Credit Information Services,* 202 F.3d 1262, 1271-73 (10th Cir.2000) (applying *BMW* to employment discrimination case); *United States v. Big D Enters.,* 184 F.3d 924, 933-34 (8th Cir.1999) (same). We will likewise use the *BMW* factors to decide whether this punitive damages award is excessive.

### a. Degree of Reprehensibility

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW,* 517 U.S. at 575, 116 S.Ct. at 1599. In assessing the reprehensibility of the defendant's conduct in *BMW,* the Supreme Court noted a number of "aggravating factors," including (1) whether the harm was not "purely economic in nature"; (2) whether the defendant's conduct "evinced ... indifference to or reckless disregard for the health and safety of others"; and (3) whether, if there was economic injury inflicted, the injury was "done intentionally through affirmative acts of misconduct or when the target [was] financially vulnerable." *Id.* at 576, 116 S.Ct. at 1599 (citation omitted). Here, while the employees received economic remedies, the harm was not necessarily purely economic. Rather, the harm included the violation of the employees' civil rights and, as the three employees testified, the infliction of worry and emotional upset. Additionally, the economic injury was intentional, done through affirmative acts at a time when the employees were financially vulnerable, due in part to the pregnancies that led W&O to remove them from the schedules.

14

W&O argues that its behavior should not be viewed as reprehensible because there was no physical abuse and because the comments to which the three employees testified did not constitute verbal abuse. Physical and verbal abuse may contribute to the reprehensibility of a defendant's discriminatory conduct. *See, e.g., Iannone v. Frederic R. Harris, Inc.,* 941 F.Supp. 403, 414-15 (S.D.N.Y.1996) (finding that lack of physical abuse tended to show that plaintiff should not receive a large punitive damages award in a sexual harassment case). However, we agree with the Seventh Circuit that where a plaintiff suffers an adverse employment action that "was not an isolated instance of discrimination by a single supervisor, but the predictable outcome of not-so-secret company practice," such that the defendant "maintained a policy of intentional disregard for the statutory rights of its female employees, we cannot say the maximum punitive damage award was inappropriate." *Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 627, 637-38 (7th Cir.1996).

### b. Ratio to Actual Damages

"The principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages has a long pedigree." *BMW,* 517 U.S. at 580, 116 S.Ct. at 1601. In comparing punitive and compensatory damages, courts should consider " '*the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred.' " *Id.* at 581, 116 S.Ct. at 1602 (quoting *TXO Prod. Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 2721, 125 L.Ed.2d 366 (1993)). The Supreme Court has not delineated "a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award," partly because "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Id.* at 582, 116 S.Ct. at 1602. Also, where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine," the ratio of punitive damages to compensatory damages may permissibly be higher. *Id.*

15

Before comparing the punitive damages to the actual damages, we must first determine what the "actual damages" were. In its brief on the merits, W&O alludes to its claim, made before the district court, that punitive damages are inappropriate where the plaintiff received back pay but no compensatory damages. *See* Appellant's Initial Brief at 22-23. We disagree with this argument and find that punitive damages may be appropriate where a plaintiff has received back pay but no compensatory damages.[5] *See Provencher v. CVS Pharmacy,* 145 F.3d 5, 12 (1st Cir.1998) (affirming grant of punitive damages where plaintiff received back pay and rejecting claim that punitive damages are only appropriate where plaintiff received compensatory damages); *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1352 (7th Cir.1995) (same). In addition to the fact that § 1981a includes no language limiting the right to punitive damages to cases where the plaintiff receives compensatory damages, *see Hennessy,* 69 F.3d at 1352 (analyzing § 1981a(b)(1)), we agree with the First and Seventh Circuits that "in redressing an injury suffered by the plaintiff, back pay awards serve a similar purpose as compensatory damages awards," *Provencher,* 145 F.3d at 12 (citing *Hennessy* ). We, therefore, may consider an award of back pay in deciding whether a punitive damages award is disproportionate to a plaintiff's actual damages award.

The parties also dispute whether the back pay and punitive damage awards should be considered for each employee or in the aggregate. If considered individually, the ratio of punitive damages to back pay is 3.8 to 1 for Nuesse ($100,000 to $26,231.43), 26.3 to 1 for McDevitt ($100,000 to $3,800.24), and 16.1 to 1 for Grossman ($100,000 to $6225.46). If considered in the aggregate, the ratio of punitive damages to back

---

[5]We need not address the issue of whether punitive damages can be appropriate under § 1981a where a plaintiff receives neither compensatory damages nor back pay. *See Timm v. Progressive Steel Treating, Inc.,* 137 F.3d 1008, 1010 (7th Cir.1998) (finding that punitive damages are appropriate under § 1981a in the absence of compensatory damages and back pay).

16

pay is 8.3 to 1 ($300,000 to $36,257.13).[6]  Because the award of punitive damages was reasonable regardless of whether considered individually or in the aggregate, we need not resolve this issue.

We start from the principle that punitive damages "are awarded solely to punish defendants and deter future wrongdoing." *Walters v. City of Atlanta,* 803 F.2d 1135, 1147 (11th Cir.1986).  As we noted when applying the *BMW* guidelines to a punitive damages award in an environmental pollution case, the combination of a small damages award and a strong state interest in deterrence of a particular wrongful act may justify "ratios higher than might otherwise be acceptable." *Johansen v. Combustion Eng'g, Inc.,* 170 F.3d 1320, 1338 (11th Cir.1999).  Indeed, the Seventh Circuit has noted that "[t]he smaller the compensatory damages, the higher the ratio of punitive to compensatory damages has to be in order to fulfill the objectives of awarding punitive damages." *Cooper v. Casey,* 97 F.3d 914, 919 (7th Cir.1996);  *see also Johansen,* 170 F.3d at 1338 (quoting *Cooper* with approval).  This is not to say that a compensatory and punitive damages are inversely proportional—indeed, in *BMW,* the Supreme Court struck down a punitive damages award that was 500 times the size of the plaintiff's compensatory damages.  517 U.S. at 582, 116 S.Ct. at 1602.  Instead, this analysis requires a court to ask whether a relatively higher ratio of punitive to compensatory damages is permissible in order to effect the deterrent purposes behind punitive damages.  Thus, in *Johansen,* we affirmed a punitive to actual damages ratio of 100 to 1 because it was "justified by the need to deter this and other large organizations from a 'pollute and pay' environmental policy."  170 F.3d at 1339.  Affirming a punitive to actual damages ratio of 59 to 1 in a sexual harassment case, the Tenth Circuit found that "in cases, such as [the plaintiff's], where the injury is primarily personal, a greater ratio may be appropriate" and that the large punitive damages award was reasonable in terms of deterring the defendant's reckless indifference

_____

[6]A question not addressed by prior precedent is whether Nuesse's front pay award should be factored into the analysis.  Nuesse was awarded front pay of 12 payments of $924.27, for a total of $11,091.24.  If Nuesse's front pay is considered, it would change the ratio of her individual awards to 2.7 to 1 ($100,000 to $32322.67) and the ratio of the aggregate awards to 6.3 to 1 ($100,000 to $47,348.37).  Because we find that the punitive damages award was reasonable without considering the front pay award, we need not address this question.

17

to its employee's rights. *Deters,* 202 F.3d at 1273; *see also id.* at 1266 (stating that the plaintiff was awarded $5,000 in compensatory damages and $295,000 in punitive damages after the statutory cap was applied). Here, W&O deliberately discriminated against Nuesse, McDevitt, and Grossman, as well as other pregnant women,[7] and only ceased applying its illegal policy because of this lawsuit. Additionally, W&O does not argue that the award is disproportionate in comparison to the net worth of the company. *Cf. id.* at 1273 (considering the "wealth and size of the defendant" in determining whether the punitive damages award was reasonable); *Morse v. Southern Union Co.,* 174 F.3d 917, 925 (8th Cir.1999) (same). We conclude that the punitive award of $300,000, whether considered individually or collectively, was reasonable in terms of the interest in deterring illegal discrimination. *See Cooper,* 97 F.3d at 920 (affirming award of punitive damages that was 12 times the award of compensatory damages because "[a]n award of punitive damages proportioned to the low compensatory damages that were awarded would have a very meager deterrent effect ... and would not be commensurate with the moral gravity of the defendants' actions").

### c. Comparable Cases

W&O argues that its conduct was not comparable to the most egregious behavior possible under Title VII and, thus, that the district court erred in finding that a punitive damages award equal to maximum permissible under the statutory caps was appropriate.[8] This argument focuses on the Seventh Circuit's

---

[7]The parties do not discuss the fact that *BMW* permitted courts to consider both "actual *and potential* damages" in weighing the reasonableness of punitive damages. 517 U.S. at 582, 116 S.Ct. at 1602. Testimony showed that W&O had applied the policy to other women and would likely have continued to apply it in the future without this lawsuit. "[I]n imposing punitive damages it is proper to consider not only the harm that actually resulted from the defendant's misdeeds but also the harm that might have resulted. This includes 'the possible harm to other victims that might have resulted if similar future behavior were not deterred.' " *Dean v. Olibas,* 129 F.3d 1001, 1007 (8th Cir.1997) (quoting *TXO Prod.,* 509 U.S. at 460, 113 S.Ct. at 2721).

[8]W&O's argument also seems to assume that the jury, and the court, would be constrained to take the most charitable view of W&O's behavior, i.e., that the pregnancy policy "arose out of the Employer's concern for the pregnant waitresses, their unborn children, and their customers." Appellant's Initial Brief at 25. While a jury would be entitled to take that perspective, some of the testimony (e.g., H. Oreal's comments to Nuesse and his statement on his EEOC affidavit) would afford the jury a basis for finding that W&O's motivations were not as benevolent as W&O wanted the jury to believe.

decision in *Hennessy,* which held that it was inappropriate for the sexual harassment plaintiff to receive punitive damages equal to 100% of the possible damages under the statutory cap "given the much more egregious nature of some sex discrimination cases." 69 F.3d at 1356. The only other circuit courts to have addressed this question have rejected the Seventh Circuit's conclusion for two reasons. The first reason is that "[n]othing in the language of the statute suggests that the cap on damages is intended to diminish the jury's role in assessing punitive damages or to alter the standard for judicial review of such awards." *Luciano v. Olsten Corp.,* 110 F.3d 210, 221 (2d Cir.1997). Additionally, because § 1981a "establishes a regime whereby the jury will set the damages, without reference to the statutory cap," it would be inappropriate and would "invade the province of the jury" for the judge to treat the statutory cap as "the limit of a damages spectrum, within which the judge might recalibrate the award given by the jury." *Deters,* 202 F.3d at 1273. We find that the reasoning of *Luciano* and *Deters,* based on the plain language of § 1981a, is persuasive and, thus, hold that it is only appropriate for a judge to reduce a punitive damages award to below the maximum allowed under the § 1981a statutory cap if the award is unreasonable or otherwise " 'shock[s] the judicial conscience and constitute[s] a denial of justice,' " *Luciano,* 110 F.3d at 221 (quoting *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992)) (alteration in original).[9] Because the punitive damages award was reasonable and because § 1981a put W&O on notice that it could be liable for punitive damages up to the statutory cap, we find that the district court did not err in refusing to reduce the punitive damages below the statutory maximum.

B.      *Front Pay*

1.      *Waiver*

W&O argues that the EEOC waived its claim to front pay for Nuesse by failing to raise it in the final pretrial order ("PTO"). Federal Rule of Civil Procedure 16(e) states that the PTO, once entered by the court,

[9]We also note that the Seventh Circuit, applying its *Hennessy* analysis, affirmed a punitive damages award constituting the maximum under the statutory cap where the defendant had a policy of refusing to promote women. *See Emmel,* 95 F.3d at 638.

19

"shall control the subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice." *Cf. Morro v. City of Birmingham,* 117 F.3d 508, 513 (11th Cir.1997) ("[W]e will reverse the trial court's decision to follow the pre-trial order only where 'the trial court has so clearly abused its discretion that its action could be deemed arbitrary.' ") (quoting *Hodges v. United States,* 597 F.2d 1014, 1018 (5th Cir.1979)).

Here, the PTO, adopted by the district court, includes two agreed statements of law addressing reinstatement and/or front pay. Statement 7 notes that "[i]f unlawful discrimination is found, the victims of that discrimination are entitled to reinstatement and full back pay." R2-69-10. Statement 11 states:

> Claimants are presumptively entitled to reinstatement (or instatement) under the "make whole" policy of the Act. As an alternative to reinstatement, front pay can be ordered. Front pay is appropriate when a claimant is entitled to reinstatement, but a hostile or otherwise unsuitable work environment counsels against reinstatement.

R2-69-12 (citations omitted). W&O argues that these statements were insufficient and notes that the EEOC failed to introduce evidence or make arguments at trial about front pay. Thus, W&O argues that the issue of front pay was not part of the trial and that the district court's award of front pay usurped the role of the jury.

W&O's arguments stem from its belief that "[t]he issue of front pay traditionally goes to the jury, and testimony regarding it is introduced into evidence during the course of the trial." Appellant's Initial Brief at 32. This claim is incorrect. *Ramsey v. Chrysler First, Inc.,* cited by W&O, observed that "[t]he award of front pay is a form of equitable relief; as such, '[t]he decision whether to grant [it] and, if granted, what form it should take, lies in the discretion of the district court.' " 861 F.2d 1541, 1545 (11th Cir.1988) (quoting *Castle v. Sangamo Weston, Inc.,* 837 F.2d 1550, 1563 (11th Cir.1988)) (first alteration added). Thus, *Ramsey* stands for the proposition that front pay is an issue for the *trial judge,* and not the jury, to decide. While we have not decided the question of whether front pay remains an equitable remedy under Title VII after passage of the Civil Rights Act of 1991, the majority of Circuits that have addressed this question have found that front pay, being an alternate remedy to reinstatement, retains its equitable nature under § 1981a. *See Gotthardt v. National R.R. Passenger Corp.,* 191 F.3d 1148, 1154 (9th Cir.1999) (finding that § 1981a(b)(3)

20

cap does not apply to front pay because it is an equitable remedy); *McCue v. State of Kansas, Dept. of Human Resources,* 165 F.3d 784, 791-92 (10th Cir.1999) (holding that "front pay is a form of equitable relief available under 42 U.S.C. § 2000e-5(g), to be awarded by the judge not the jury"); *Martini v. Federal Nat'l Mortgage Assoc.,* 178 F.3d 1336, 1348-49 (D.C.Cir.1999) ("Like the majority of circuits, we have regarded frontpay as an equitable remedy available under section 706(g) [of Title VII] both before and after the Civil Rights Act of 1991 made compensatory damages available under Title VII."), *cert. dismissed,* --- U.S. ----, 120 S.Ct. 1155, 145 L.Ed.2d 1065 (2000); *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 423 n. 19 (5th Cir.1998) ("[T]he right to a jury trial provided by section 1981a(c) does not include the power to determine the availability of back pay or front pay. These are equitable remedies to which no right to jury trial attaches.") (citations omitted); *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 952 (7th Cir.1998) ("As the equivalent of reinstatement, front pay falls squarely within the statutory language authorizing 'any other equitable relief.' ") (quoting 42 U.S.C. § 2000e-5(g)(1)). *But see Hudson v. Reno,* 130 F.3d 1193, 1203-04 (6th Cir.1997) (treating front pay as compensatory damages for "future pecuniary losses" under § 1981a(b)(3) in part because the Sixth Circuit had historically "treated front pay, in most contexts, as a legal, rather than an equitable remedy"), *cert. denied,* 525 U.S. 822, 119 S.Ct. 64, 142 L.Ed.2d 50 (1998). We hold that front pay retains its equitable nature under Title VII after passage of the Civil Rights Act of 1991 and, thus, that the district court did not err in deciding front pay without submission to the jury.[10]

Having reaffirmed the principle that front pay is an equitable remedy awarded at the discretion of the district court, we reject W&O's claim that the EEOC waived the claim of front pay due to the alleged paucity of references to front pay in the PTO and its failure to submit evidence of or to argue front pay during the jury trial.[11]

---

[10]One consequence of this ruling is that front pay is not included under the § 1981a(b)(3) statutory caps. *See Gotthardt,* 191 F.3d at 1154; *Martini,* 178 F.3d at 1349.

[11]Because of this conclusion, we need not resolve W&O's claims that the statements of law made in the PTO are insufficient to preserve a remedy raised in the complaint.

*2.     Reinstatement*

We turn to W&O's claim that the district court erred in awarding front pay to Nuesse rather than reinstatement. "In addition to back pay, prevailing Title VII plaintiffs are presumptively entitled to either reinstatement or front pay." *Weaver v. Casa Gallardo, Inc.,* 922 F.2d 1515, 1528 (11th Cir.1991). We review the "decision to award front pay in lieu of reinstatement for an abuse of discretion." *Farley v. Nationwide Mutual Ins. Co.,* 197 F.3d 1322, 1338 (11th Cir.1999).

While we presume that reinstatement is the appropriate remedy in a wrongful discharge case, *id.* at 1338, "when extenuating circumstances warrant, a trial court may award a plaintiff front pay in lieu of reinstatement," *id.* at 1339. In deciding whether to award front pay, rather than reinstatement, courts look to whether " 'discord and antagonism between the parties would render reinstatement ineffective as a make-whole remedy,' " *Lewis v. Federal Prison Indus.,* 953 F.2d 1277, 1280 (11th Cir.1992) (quoting *Goldstein v. Manhattan Indus.,* 758 F.2d 1435, 1449 (11th Cir.1985)), the " 'defendant's management [had] intimidated or threatened' " the plaintiff, *id.* (quoting *Eivins v. Adventist Health Sys.,* 660 F.Supp. 1255, 1263 (D.Kan.1987)), or the termination had harmed the plaintiff's emotional well-being, *id.* Evidence in the record supports both the claim that W&O has stated its willingness to re-hire Nuesse and the claim that there is discord and antagonism between the parties, including the alleged statement made to Nuesse that she should not show her face at the Rustic Inn, H. Oreal's statement that he liked Nuesse until this case, and W. Oreal's statement that the case had poisoned the atmosphere at the Rustic Inn. The district court's failure to offer *any* explanation for its decision to award front pay is problematic, for "we do require that a trial court 'carefully articulate' its reasons for awarding front pay in lieu of reinstatement.' " *Farley,* 197 F.3d at 1339; *see also* R5-167 at 2 (awarding front pay to Nuesse without making factual findings). Accordingly, we vacate the

22

award of front pay and remand for the district court to make factual findings as to whether reinstatement is viable.[12]

### III. Appeal No. 98-5646

"This court will not disturb a costs award in the absence of a clear abuse of discretion." *Technical Resource Servs. v. Dornier Med. Sys.,* 134 F.3d 1458, 1468 (11th Cir.1998). Prevailing parties are entitled to receive costs under Fed.R.Civ.P. 54(d), *see Gilchrist v. Bolger,* 733 F.2d 1551, 1556-57 (11th Cir.1984), and the United States may receive costs like other prevailing parties, *see Pine River Logging & Improvement Co. v. United States,* 186 U.S. 279, 296, 22 S.Ct. 920, 927, 46 L.Ed. 1164 (1902). However, a court may only tax costs as authorized by statute. *See Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 445, 107 S.Ct. 2494, 2499, 96 L.Ed.2d 385 (1987) (rejecting claim that "a federal court is empowered to exceed the limitations explicitly set out in [28 U.S.C.] §§ 1920 and 1821 without plain evidence of congressional intent to supersede those sections"), *superseded on other grounds,* 42 U.S.C. § 1988(c) (1991).

The district court awarded costs to the EEOC pursuant to 28 U.S.C. § 1920. W&O does not dispute the EEOC's entitlement to costs as a prevailing party. However, W&O challenges each of the costs awarded to the EEOC. We vacate the award of costs solely as to the EEOC's exhibit costs and affirm the award of costs as to witness fees, deposition costs, photocopying costs, and costs of service.

### A.    *Witness Fees for Nuesse, McDevitt, and Grossman*

W&O challenges the award of witness fees for Nuesse, McDevitt, and Grossman. Noting that witnesses who are parties in interest to a case are generally not awarded fees but that W&O had failed to raise that objection, the district court awarded the EEOC $160.00 in witness fees for the three women after reducing the amount pursuant to the objections that W&O actually did make.[13] *See also Hodge v. Seiler,* 558

---

[12]While it may be implicit in the district court's award of front pay that the court credited the EEOC's claims of antagonism toward Nuesse and discounted W&O's claims that reinstatement was a viable option, we must require the district court to make explicit findings on this issue.

[13]The EEOC has not appealed the district court's reduction of the requested witness fees.

F.2d 284, 287 (5th Cir.1977) (noting the rule that courts will generally not award witness fees for party-witnesses); *Barber v. Ruth,* 7 F.3d 636, 646 (7th Cir.1993) (applying rule to witnesses who were not nominal parties but were "parties in interest"). We have never addressed the issue of how a district court should determine whether a witness who was not a nominal party is a "party in interest" and, thus, ineligible for witness fees, and we have found no case in any court addressing whether claimants in an EEOC case are ineligible for witness fees as "parties in interest." However, this case is not appropriate for resolution of these questions because of W&O's failure to raise them at the district court. "Failure to raise an issue, objection or theory of relief in the first instance to the trial court generally is fatal." *Denis v. Liberty Mut. Ins. Co.,* 791 F.2d 846, 848-49 (11th Cir.1986); *see also Miller Indus. v. Caterpillar Tractor Co.,* 733 F.2d 813, 820 n. 12 (11th Cir.1984) ("Because the defendant's objection does not question this court's subject matter jurisdiction, we find that the defendant's failure to raise the objection at the trial level resulted in its waiver."). We have previously applied this rule to a party's failure to object to witness fees. *See Kansas City So. Ry. Co. v. Caruso,* 387 F.2d 602, 602 (5th Cir.1968). Accordingly, we find that W&O waived its objection to the witness fees assessed for Nuesse, McDevitt, and Grossman.

B.      *Deposition Costs*

Taxation of deposition costs is authorized by § 1920(2). *See United States v. Kolesar,* 313 F.2d 835, 837-38 (5th Cir.1963) ("Though 1920(2) does not specifically mention a deposition, ... depositions are included by implication in the phrase 'stenographic transcript.' "). "[W]here the deposition costs were merely incurred for convenience, to aid in thorough preparation, or for purposes of investigation only, the costs are not recoverable." *Goodwall Const. Co. v. Beers Const. Co.,* 824 F.Supp. 1044, 1066 (N.D.Ga.1992), *aff'd,* 991 F.2d 751 (Fed.Cir.1993). The question of whether the costs for a deposition are taxable depends on the factual question of whether the deposition was wholly or partially " 'necessarily obtained for use in the case.' " *Newman v. A.E. Staley Mfg. Co.,* 648 F.2d 330, 337 (5th Cir. Unit B 1981) (quoting § 1920(2)). We will not reverse the district court's taxation of deposition costs absent an abuse of discretion. *Id.*

24

In this case, W&O challenges every deposition for which the EEOC sought costs. Almost all of the deponents were on W&O's witness list in the PTO; these include W. Oreal, Donlin, McDonald, Merlone, H. Oreal, O'Shea, Smith, Tatarka, Zobel, Pescitelli, DiClemente, Nuesse, McDevitt, Grossman, and Diascro. We have upheld the taxation of a deposition where the losing party listed the deponent on its witness list. *See Murphy v. City of Flagler Beach,* 761 F.2d 622, 631 (11th Cir.1985). Taxation of deposition costs of witnesses on the losing party's witness list is reasonable because the listing of those witnesses indicated both that the plaintiff might need the deposition transcripts to cross-examine the witnesses, *see Independence Tube Corp. v. Copperweld Corp.,* 543 F.Supp. at 717 (N.D.Ill.1982), and that "the information those people had on the subject matter of this suit was not so irrelevant or so unimportant that their depositions were outside the bound of discovery," *id.* at 718.

Several of the depositions were used by the EEOC at summary judgment or at trial. Portions of the depositions of W. Oreal, McDonald, McBride, Brenner, and Diascro were read into evidence at trial, while the EEOC used the depositions of DiClemente and Diascro to conduct cross-examination at trial. It is not necessary to use a deposition at trial for it to be taxable, but admission into evidence or use during cross-examination tends to show that it was necessarily obtained. *See, e.g., Kolesar,* 313 F.2d at 840 ("[T]he utility (and necessity) for a deposition is not alone measured by whether all or any part of it[ ] is formally offered in evidence as such. A deposition used effectively in cross examination may have its telling effect without so much as a line of it being formally proffered."). The following deponents testified at trial: Nuesse, McDevitt, Donlin, Grossman, and H. Oreal. Depositions for these witnesses may be taxable, in the discretion of the district court. *See id.* (noting ways that depositions may be necessary for trial preparation). Similarly, the depositions of Donlin, O'Shea, and Raguse were relied upon by the EEOC in its motion for summary judgment. A district court may tax costs "associated with the depositions submitted by the parties in support of their summary judgment motions." *Tilton v. Capital Cities/ABC, Inc.,* 115 F.3d 1471, 1474 (10th Cir.1997). While W&O argues that the use of these depositions was minimal or that they were not critical

25

to the EEOC's ultimate success, W&O has not demonstrated that any portion of the depositions was not "related to an issue which was present in the case at the time the deposition was taken." *Independence Tube Corp.,* 543 F.Supp. at 718.

Accordingly, we find that the district court did not abuse its discretion in taxing the costs for those depositions for which there is no other challenge and, therefore, affirm the district court as to the deposition costs for the depositions of W. Oreal, Donlin, McDonald, Merlone, H. Oreal, O'Shea, Smith, McBride, Raguse, DiClemente, Brenner, and Diascro.[14] We turn now to the remaining six depositions.

*1.      Pescitelli, Tatarka, and Zobel*

The depositions of Pescitelli, Tatarka, and Zobel were not used by the EEOC at summary judgment or at trial, and the EEOC successfully moved *in limine* to have the testimony of all three of these witnesses excluded from trial. We have found no case law stating that a prevailing party who successfully moved to exclude the testimony of witnesses was barred from recovering the costs of deposing the witnesses. Pescitelli was Nuesse's obstetrician and Tatarka and Zobel were servers at the Rustic Inn; there is no evidence showing that their depositions were not related to an issue in the case when the depositions were taken. Accordingly, we affirm the district court as to the deposition costs for Pescitelli, Tatarka, and Zobel.

*2.      Nuesse, McDevitt, & Grossman*

There is no consensus as to whether the costs for depositions of parties (or parties in interest) may be taxed. *Compare Heverly v. Lewis,* 99 F.R.D. 135, 136 (D.Nev.1983) (refusing to grant prevailing party travel costs for attendance at her own deposition because "a prevailing party may not recover, as a cost of suit,

_____

[14]W&O does argue that several of these witnesses (particularly the women who were servers at the Rustic Inn) offered cumulative testimony and that the EEOC should not have needed to formally depose the witnesses because the EEOC had already interviewed them. Given that W&O listed these witnesses on its witness list as part of the PTO and that the district court exercised its discretion in taxing costs for the allegedly cumulative witnesses, we reject that argument. Also, we have found no caselaw to show that the fact that the EEOC has interviewed a prospective witness bars the taxation of deposition costs for that witness. *Cf. Cengr v. Fusibond Piping Sys.,* 135 F.3d 445, 455 (7th Cir.1998) (rejecting claim that depositions of defendant's employees were not taxable because defendant should have "rel[ied] on the oral statements or affidavits of their employees rather than depositions which were already taken").

26

the expenses incident to the taking of his or her own deposition"); *Morrison v. Alleluia Cushion Co.,* 73 F.R.D. 70, 72 (N.D.Miss.1976) (refusing to tax deposition costs for witness who was "an active party in the litigation") *with Scallet v. Rosenblum,* 176 F.R.D. 522, 527 (W.D.Va.1997) (permitting taxation of "copies of deposition transcripts of party deponents" where the copies were reasonably necessary); *Hancock v. Albee,* 11 F.R.D. 139, 141 (D.Conn.1951) (taxing cost of copy of deposition of prevailing plaintiff because it was "reasonably necessary that plaintiffs' counsel should have a copy in order to protect the plaintiffs' rights by holding the impeachment within proper limits"). We find more persuasive the view of the courts that do not bar taxation of costs for depositions of parties but, instead, look to whether the depositions were reasonably necessary. After reviewing the record and, particularly, noting that McDevitt's deposition was used to impeach her during the trial, *see, e.g.,* R7-173-95, we find that the district court did not abuse its discretion in taxing the costs of the depositions of Nuesse, McDevitt, and Grossman.

*3.      Conclusion*

We affirm the taxation of costs as to all of the depositions.

*C.      Other Costs*

*1.      Exemplification Costs*

W&O argues that exhibit costs are not taxable. The only statutory provision arguably covering exhibit costs is § 1920(4), which permits taxation of "[f]ees for exemplification and copies of papers necessarily obtained for use in the case." *See, e.g., Maxwell v. Hapag-Lloyd Aktiengesellschaft,* 862 F.2d 767, 770 (9th Cir.1988) (holding that § 1920(4) covers exhibits and other illustrative materials); *In re Air Crash Disaster at John F. Kennedy Int'l Airport on June 24, 1975,* 687 F.2d 626, 631 (2d Cir.1982) (same). However, we have held that "[t]here is no statutory provision for the taxation of charts and exhibits as costs." *Johns-Manville Corp. v. Cement Asbestos Products Co.,* 428 F.2d 1381, 1385 (5th Cir.1970). Notwithstanding this holding, *Johns-Manville* permitted taxation of exhibit costs if the prevailing party received pretrial authorization to produce the exhibits. *See id.* We must determine what effect the Supreme

27

Court opinion in *Crawford Fitting* has on *Johns-Manville*. *Crawford Fitting,* which was issued after *Johns-Manville,* held that courts can tax costs only with statutory authorization. 482 U.S. at 445, 107 S.Ct. at 2499. Considering *Johns-Manville* in light of *Crawford Fitting,* we hold that exhibit costs are not taxable because there is no statutory authorization.[15]

*2.       Copy Costs*

W&O challenges the copying costs awarded to the EEOC on the ground that the copies were not "necessarily obtained for use in the case" pursuant to § 1920(4). W&O argues that the copies were not necessary because they were neither used as court exhibits nor furnished to the court or opposing counsel.[16] "Use of information contained in a file is not a prerequisite to finding that it was necessary to copy the file." *Cengr,* 135 F.3d at 455; *see also United States for the Use and Benefit of Evergreen Pipeline Const. Co. v. Merritt Meridian Const. Corp.,* 95 F.3d 153, 173 (2d Cir.1996) ("Photocopying costs may be recovered even though the underlying document was not admitted at trial."). Rather, like with depositions, in evaluating copying costs, the court should consider whether the prevailing party could have reasonably believed that it was necessary to copy the papers at issue. Here, the copies at issue were of documents produced by W&O pursuant to the EEOC's motion to produce. "Copies attributable to discovery" are a category of copies

---

[15]The fact that other circuits disagree with this analysis is irrelevant. Under *Bonner v. City of Prichard, Johns-Manville* is binding precedent on this circuit. 661 F.2d 1206, 1207 (11th Cir.1981). "Under the prior panel precedent rule, we are bound by earlier panel holdings ... unless and until they are overruled en banc or by the Supreme Court." *United States v. Smith,* 122 F.3d 1355, 1359 (11th Cir.1997). While the ruling in *Crawford Fitting* undermines the holding in *Johns-Manville* that costs may be taxed without statutory authorization for exhibits if the party received pretrial authorization to produce the exhibits, the holding in *Johns-Manville* that there is no statutory authorization for such taxation has not been undermined by any Supreme Court or *en banc* decision. *But see Louisiana Power & Light Co. v. Kellstrom,* 50 F.3d 319, 335 (5th Cir.1995) (requiring pretrial authorization for trial exhibits before permitting taxation of costs but not addressing effect of *Crawford Fitting* on taxation of exhibit costs under *Johns-Manville* ).

[16]W&O also argues that the copies were not "necessarily obtained" because they were allegedly sent to the EEOC District Manager in Washington, D.C. The EEOC states that the Washington, D.C. address found on the copying bill was merely the billing address. This dispute, however, is irrelevant to the question of whether the copies were necessarily obtained.

28

recoverable under § 1920(4). *Desisto College, Inc. v. Town of Howey-in-the-Hills,* 718 F.Supp. 906, 913 (M.D.Fla.1989). Accordingly, we find that the district court did not abuse its discretion in taxing the EEOC's photocopying costs.

3. *Service of Process Costs*

W&O challenges the award of costs for the EEOC's use of private process server on the ground that § 1920 only permits taxation of fees of the U.S. Marshal for process service. Pursuant to § 1920(1), "[f]ees of the clerk and marshal" may be taxed as costs. However, "[s]ince the enactment of section 1920(1), the method of serving civil summonses and subpoenas has changed. The U.S. Marshal no longer has that responsibility in most cases, but rather a private party must be employed as process server." *Alflex Corp. v. Underwriters Laboratories, Inc.,* 914 F.2d 175, 178 (9th Cir.1990) (citing Fed.R.Civ.P. 4(c) & 45(c)). We have yet to address the question of whether a party who utilizes a private process server may be reimbursed for fees under § 1920(1).[17] The Eighth Circuit has rejected taxation of fees for private process servers on the ground that § 1920 "contains no provision for such expenses." *Crues v. KFC Corp.,* 768 F.2d 230, 234 (8th Cir.1985); *see also Breitenbach v. Neiman Marcus Group,* 181 F.R.D. 544, 548 (N.D.Ga.1998) (same); *Desisto College,* 718 F.Supp. at 913 (same); *Zdunek v. Washington Metro. Area Transit Auth.,* 100 F.R.D. 689, 692 (D.D.C.1983) (same). The Ninth Circuit permits taxation of fees for private process fees solely on the basis of a historic shift to the use of private process servers, *Alflex,* 914 F.2d at 178. The Second Circuit and Seventh Circuit have disapproved of that approach and instead found that reading § 1920(1) in conjunction with 28 U.S.C. § 1921, which lists fees of the marshal, justifies taxation of "service costs that do not exceed the marshal's fees, no matter who actually effected service." *Collins v. Gorman,* 96 F.3d 1057,

---

[17]In *Loughan v. Firestone Tire & Rubber Co.,* we summarily affirmed an award of costs that included "costs of service of subpoenas, witnesses, and mileage fees." 749 F.2d 1519, 1526 n. 2 (11th Cir.1985). *Loughan,* which was decided before *Crawford Fitting,* does not address the possible distinction between service fees for marshals and private process servers or whether § 1920 provides support for payment of private process servers.

1060 (7th Cir.1996); *Evergreen Pipeline,* 95 F.3d at 172 (holding that it is within the district court's discretion to award private process server fees).

We hold that private process server fees may be taxed pursuant to §§ 1920(1) and 1921. We reject the reasoning of *Alflex,* which is contrary to the holding of *Crawford Fitting,* but find persuasive the reasoning that § 1920(1) "refers to the fees 'of' the marshal but does not require payment 'to' the marshal" and, accordingly, that the "fees of the marshal" refers to fees authorized by § 1921, rather than fees collected by the marshal. *Collins,* 96 F.3d at 1060. Thus, a district court does not abuse its discretion in taxing private process server fees that do not exceed the statutory fees authorized in § 1921. In light of this conclusion, we vacate the award of procees server fees and remand to the district court for determination as to whether the fees requested by the EEOC are commensurate with the limits found in § 1921.

## IV. Conclusion

As to W&O's appeal of the damage awards, we AFFIRM the award of punitive damages and VACATE the award of front pay and REMAND for the district court to make factual findings as to whether reinstatement is feasible. As to the appeal of the award of costs, we AFFIRM the award of witness fees, deposition costs and photocopying costs, VACATE the award of exhibit costs and of process server fees, and REMAND for re-evaluation of the process server fees request.