[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 6, 2010
JOHN P. LEY
ACTING CLERK

_____

No. 08-16291

_____

D. C. Docket No. 04-01542-CV-ORL-28-DAB

DAWN GEORGETTE MYERS,

Plaintiff-Appellee-
Cross-Appellant,

versus

CENTRAL FLORIDA INVESTMENTS, INC.,
DAVID SIEGEL, et al.,

Defendants-Appellants-
Cross-Appellees.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(January 6, 2010)

Before MARCUS, FAY and ANDERSON, Circuit Judges.

MARCUS, Circuit Judge:

Defendants Central Florida Investments, Inc., Westgate Resorts, Inc., Westgate Resorts, Ltd., CFI Sales and Marketing, Ltd., and David Siegel appeal and plaintiff Dawn Georgette Myers cross-appeals the judgment of the district court, after a jury trial, in favor of Myers in the amount of $610,469.84. Myers recovered $103,622.09 in compensatory damages and $506,847.75 in punitive damages arising from her claim of state law battery, but took nothing on her claims of sexual harassment under state and federal civil rights acts. Defendants challenge the awards under state and federal law, asserting that the evidence can support neither the compensatory award nor the punitive award. Myers, in turn, asserts that the district court improperly limited punitive damages, barred evidence of harassment, denied her fees, and dismissed her state law claims. Because the district court correctly answered the many questions raised in these appeals, we affirm its judgment in all respects.

I. Background

A. Facts

The essential facts adduced at trial are these: Central Florida Investments, Inc. ("CFI"), is the parent company for a number of associated entities -- Westgate Resorts, Inc., Westgate Resorts, Ltd., Westgate Lakes, Inc., Westgate Lakes, Ltd., and CFI Sales and Marketing, Ltd. -- which collectively comprise a real estate

company whose primary business is the development and sale of time-share resorts throughout the United States. Siegel is the chairman of the board, president, chief executive officer, and sole stockholder of CFI. CFI, which is the largest privately held time-share company in the world, is valued at approximately $471,000,000, while Siegel himself has a net worth of some $324,000,000.

Dawn Myers testified that she first came to work at CFI as a salesperson in 1986. She had a real estate license, and her job required her to sell time-shares. Myers was also an award-winning cosmetologist who was licensed to do hair, nails, spa treatments, and skin care. Cosmetology was her professional passion, and she hoped one day to develop a spa at one of CFI's resorts.

In 1994, Myers called the CFI corporate office in order to request an appointment with Siegel so that she could make her pitch. Siegel, on hearing her thoughts, encouraged her to pursue the project, and, as Myers developed the concept, the two went on to communicate about it every week for about a year. Finally, Siegel authorized the creation of the spa.

During the ensuing period, Myers claims that she split her time at CFI, working in the morning in sales and working in the afternoon on the spa. She began to draw a regular salary, rather than work on straight commission. She also spent a lot of time dealing with Siegel, and the two developed a friendship. Myers

would later testify, "what he told me that we had in common was the fact that we're both ambitious, we both are hard workers, [and] we both, if we believe in something, you know, we go for it."

Siegel was interested in Myers romantically, and their friendship began to change as Siegel made that increasingly clear. According to Myers, it was at the CFI Christmas dance in 1995 where Siegel made his first unwanted advance. Siegel had asked Myers to dance, and as they danced he kissed her. Myers was shocked. Siegel's overtures towards Myers continued. He twice offered, at CFI functions and in Myers' presence, $1,000,000 to Myers' boyfriend for one night with Myers. Myers considered the offers to be disrespectful and inappropriate. On several occasions, Siegel made marriage proposals to Myers, some more serious than others, some on company property, and at least one in the presence of other CFI employees. He offered to buy Myers lavish gifts, including a Porsche, if she agreed to date him. And once, unsolicited, he even gave her a $10,000 check. Myers was devastated: "I started crying and I said, you know, how could you do this? . . . I said I don't need your help. Our friendship does not have a price tag on it. How many times do I have to tell you? I don't want your money. I don't need your help."

Siegel's pursuit of Myers also began to color their interactions in the

4

workplace. Myers testified that he transferred her to a new office, and informed her that he had done it so that she would be closer to him. He began to visit her in the office nearly every day at 11 a.m., even asking for her if he could not find her himself. When he did find her, she testified at trial, he would give her a hug and sometimes let his hands slip down to her behind, in full view of her coworkers. Sometimes he slapped her behind at work in front of her staff. During lunches at CFI, Siegel would fondle Myers' legs for everyone to see; he touched her legs at the company restaurant at least twenty times, and probably many more. Siegel also made inappropriate comments to Myers at work. He talked about her weight, and at the company gym, he told her that "your ass is getting fat," but that it was "okay, because [your] boobs are big." And, at a company awards dinner one night, Siegel told the CFI crowd that he had asked Myers to come as his date, but that she had refused him. She testified that the incident made her terribly embarrassed.

Myers and Siegel frequently traveled together, and these trips generally fueled the tension between them. Thus, for example, Siegel and Myers traveled together for business to the Bahamas, where, she testified, he propositioned her. Similarly, in 1997, Myers agreed to travel to New York with Siegel on business. Myers, who was first told that they would have separate hotel rooms, and who was later told that they would have separate bedrooms in the same suite, said that she

5

grew "absolutely furious" upon discovering that their hotel room had only bedroom. She went to the bathroom and cried, but resolved nevertheless to go about her business in New York as planned. Myers also agreed to accompany Siegel -- as his friend -- to attend the bar mitzvah of the son of a CFI executive in Miami. She became "very angry," however, when Siegel invited her on a romantic walk on the beach.

On multiple occasions, Myers asked Siegel to stop his inappropriate behavior. Myers testified that, "every time I went to him and sincerely asked him, please, David, stop," he told her that he would not do it again. "He seemed extremely sincere that he would stop, with the exception of the times that he would make a joke and say I want people to think that, you know, we're together or you're my girlfriend." Myers testified that Siegel in fact wanted people to think that they were together.

Yet Myers and Siegel continued to work closely together, and continued to be friends. Myers testified, "it never crossed my mind at that time to sever my friendship with him," because "he was my friend and he was important to me and he . . . had given me this opportunity and I was extremely grateful, extremely grateful." Myers saw Siegel as a mentor: "how many people get an opportunity to have someone like Mr. Siegel who's brilliant in business in so many ways to, you

6

know, be their friend, to coach them, to anytime if I need to talk to him and I picked up the phone, he would take my call. I mean it meant everything to me."

Myers considered taking a harder line with Siegel, but she said that she feared losing her job: "number one, he's my boss." She thought that, because she did not have a college degree, she might flounder professionally outside of CFI. She also testified that she could not simply quit: "I have a home. . . . I had bills to pay. I was taking care of my mom. I can't just quit my job. I'm the only one that pays my bills. I couldn't do it. And I really thought that some day it would stop."

Work on the spa continued. Construction began in 1997 or 1998, Myers was named the executive director of the spa, and she stopped working in sales in order to devote her full attention to development of the spa. She was given control over management of the facility, including design and staffing, subject to approval from the front office.

According to Myers, once the spa opened in November of 1999, it became a frequent site of Siegel's unwelcome advances. On eight to ten occasions, Siegel came to the spa looking for treatments from Myers. Towards the end of these sessions, Siegel would, Myers testified, "let his hands wander and wander up the back of my legs and on to my butt." She asked him to stop, and pushed his hands away, but he persisted. Furthermore, on several occasions, towards the end of the

7

treatments, Siegel would expose himself unnecessarily to Myers; he would do so with "a big old smile on his face . . . , so I would think he knew he was doing it."

Several times Jackie Siegel, who was Siegel's third wife, joined Siegel and Myers in the spa. One time, while Jackie was present, Siegel told Myers that "I wanted to have the two of you together and, you know, well, at least I have the two of you together now."

Myers' said that her most public humiliation occurred at a CFI charity event in 2000. There were hundreds of employees at the event, some of whom had dressed as celebrities. At one point Myers, who was dressed as Marilyn Monroe, was summoned to the stage by Siegel, the master of ceremonies, to sing Happy Birthday. Though Myers did not want to serenade him, Siegel played to a crowd that was increasingly egging her on, and she felt that she had no choice.

Myers took the stage, where Siegel beckoned her to sit on his lap. Though nervous, and completely shocked, Myers tried "to be a good sport." She placed a napkin on his lap, intending to sit on it. She testified, "as soon as I put it on his lap, he took his hand underneath the napkin and you know, like made it go up like that." He was feigning an erection. But she sat down, sang the song -- at the end of which he kissed her -- and rushed off the stage: "I just knew I needed to get out of there. I just needed to get out of there." Her face had turned red, she felt the

8

onset of a migraine headache, and as soon as she left the stage, she began to cry; she felt humiliated. Myers said she was "dying and mortified."

Rumors inevitably began to spread throughout CFI about Siegel and Myers. Myers claimed that rumors of a relationship between her and Siegel were ruining her reputation. "[T]here were rumors flying all around the resort that I was having this wild affair with Mr. Siegel and no one would believe me that we were friends." Indeed, she said, there were hundreds of rumors about Siegel and Myers, and it was well-known that Siegel was in love with Myers. Myers testified that the gossip was "horrible" and "vicious," and caused her to lose friendships. She added that, during the celebrity waiter event, she could hear the crowd snickering: "the people . . . would always gossip and say such hateful, . . . mean things." This atmosphere made it difficult for Myers to go to work: "the whole company was gossiping about me. Executives were gossiping about me. Things were getting back to me that executive's wives were saying, people that didn't even know me. I didn't want to go to work." Myers testified that, ultimately, some CFI employees just thought of her as "a dumb blonde bimbo with big boobs."

When Myers began dating a new man in May of 2000, her already rocky relationship with Siegel took a turn for the worse. She testified: "His attitude just completely changed. He was angry, he was just, when you were around him he

9

tried to just talk down to you and degrading and humiliating." He began to behave differently towards Myers: "it was very, just aggressive and mean and just demeaning and not like how it was before . . . . It was a completely different tone."

This new attitude manifested itself on several ugly occasions. Once, Siegel pinned Myers against the wall right in front of the reception desk at the spa, and in front of the three staff members who were working the desk. Myers testified, "Georgette, he said, your breasts look great in that sweater you're wearing." He had his hand on her shoulder and was leaning into her. Myers attempted to maintain her composure, signaling to Siegel with her hands to back off, and looked to be relieved once it was over. Another time, after Siegel and Jackie each had treatments, and again in the presence of spa staff, Siegel approached Myers and pinned her against a wall, suggesting that Myers "come home and lay around with" him and Jackie. He was reaching out and touching Myers. Myers told him to stop and tried to push him away. After Myers extricated herself from the situation, and while she was walking back towards her office, Siegel further commented that he wished Myers "would crawl all over" him.

In 2000, Myers brought her concerns to a number of company executives, but she said that they were of little help. She spoke with Mark Waltrip, CFI's chief operating officer, who told her that for her to date another man was "like waving a

red flag in front of a bull. You know how he feels about you." She also spoke with Paul Bosch, director of resort operations at CFI, who told her that she "should think about leaving the company." Finally, she complained to Sandy Jones, CFI's director of human resources, who once told Myers, "what are you going to do, he's the president of the company," and another time explained, "that's David." Jones was not the only one who believed that the rules did not apply to the president; Siegel himself testified that, even if there were corporate rules binding him, he could change them at his will.

Some CFI employees, including executives, either played an active role in Siegel's pursuit of Myers or were asked to. Jim Gissy, executive vice president of sales and marketing, called Myers into his office to tell her that he thought she and Siegel would be great together. Michael Marder, CFI's general counsel, told Myers at his son's bar mitzvah that he was "really glad to see that you're here with David." Siegel approached Roger Behrmann, a manager at CFI, on numerous occasions, Gail Miller, a manager in sales, and Mary Fetzner, a server at the CFI restaurant, to ask them to put in a good word for Siegel to Myers; they all complied.

Ultimately, the environment at CFI took its toll on Myers. She testified that she was "torn." On one hand, she had been "given this amazing opportunity," but

11

on the other hand, she felt "deflated" and "didn't want to go to work." She testified that she felt as if she were "on an emotional roller coaster all the time." And Siegel's change in behavior only made matters worse: "I was hurt. I was sad. I didn't understand."

Myers was suspended in December of 2000, and her employment with CFI was terminated later that month. In that final year at CFI, she earned $102,223.14. On September 14, 2001, Myers filed a complaint with the Equal Employment Opportunity Commission ("EEOC").

B.    Procedural History

On April 5, 2004, CFI sued Myers in the County Court of the Ninth Judicial Circuit in Orange County, Florida, seeking to recover $6,230 on the theories of a promissory note, money lent, and unjust enrichment. On May 19, 2004, Myers answered the suit and counterclaimed against CFI and Siegel, alleging disparate treatment and hostile work environment, in violation of both the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760, and Title VII of the federal Civil Rights Act, 42 U.S.C. § 2000e, et seq., abuse of process, battery, assault, conspiracy, and contractual attorney's fees.

The case was then removed to the United States District Court for the Middle District of Florida, remanded to county court, and transferred to the Circuit

Court for the Ninth Judicial Circuit. The circuit court dismissed CFI's claim for the $6,230, without prejudice, and ordered Myers to submit a new complaint. On October 1, 2004, Myers filed a new complaint. This one included the same allegations contained in the May 19 counterclaim, but added counts for slander and malicious prosecution. On October 20, 2004, the defendants removed the action to federal court in the Middle District of Florida.

On April 20, 2005, the district court dismissed some of the claims, including several of the state law claims -- abuse of process, slander, malicious prosecution, conspiracy and attorney's fees -- over which the court had declined to exercise supplemental jurisdiction. Myers amended her complaint again. The Second Amended Complaint contained nine counts. Against Siegel and CFI, Myers alleged false imprisonment and battery, common law claims in Florida, and inducement to prostitution, in violation of Florida Statute § 796.09. Against CFI alone, she alleged sex discrimination under Title VII and the FCRA, retaliation under Title VII, the FCRA, and the Florida Private Whistleblower Act ("Whistleblower Act"), Fla. Stat. § 448.101-105, and negligent retention and supervision, a common law claim. Thereafter, the district court dismissed the Whistleblower Act claim, as well as the inducement to prostitution and negligent retention and supervision claims. The two sexual harassment claims, the two

13

retaliation claims, the battery claim, and the false imprisonment claim remained.

On April 24, 2006, the district court granted summary judgment to CFI on the sexual harassment and retaliation claims, and remanded the two remaining state law claims to state court. But, thereafter, a per curiam panel of this Court reversed in part the grant of summary judgment, finding that Myers had presented sufficient evidence to support her Title VII and FCRA hostile work environment claims. The state law claims that had been remanded were reinstated. See Myers v. Cent. Fla. Invs., Inc., 237 F. Appx. 452 (11th Cir. 2007).

After six days of trial,[1] the jury found that Siegel had "subjected the Plaintiff to a hostile or abusive work environment because of her sex or gender," but that none of the acts of sexual harassment took place on or after September 15, 2000, the point at which the statute of limitations barred recovery.[2] The jury also found that Siegel had committed battery against Myers, and that it had occurred on or

---

[1] The jury heard evidence on only battery and sexual harassment, as Myers had by that time withdrawn her claim for false imprisonment.

[2] A litigant under the FCRA must file a complaint with the state of Florida or the EEOC within 365 days of the purported violation. Fla. Stat. § 760.11(a). Because Myers had filed a complaint with the EEOC on September 14, 2001, the defendants could only be held liable under the FCRA for sexual harassment occurring on or after September 15, 2000. Moreover, under Title VII, the EEOC complaint must be filed within 300 days of any violation, 42 U.S.C. 2000e-5(e); see also City of Hialeah, Fla. v. Rojas, 311 F.3d 1096, 1101 (11th Cir. 2002), meaning that defendants could only be liable under Title VII for conduct occurring on or after November 19, 2000.

14

after May 21, 2000, the relevant date under the statute of limitations.[3]

Because recovery was barred by the statute of limitations under Title VII and the FCRA, the jury did not reach the issue of damages on the sexual harassment claims. As for the battery claim, however, the jury awarded Myers $102,223.14 in compensatory damages and $5,276,640.00 in punitive damages. These damages were leveled against both Siegel and CFI. Final judgment was entered for Myers in the amount of $5,378,863.14 on the battery claim.

Thereafter, the district court denied several post-trial motions; it did, however, grant the defense motion that the judgment reflect that CFI had prevailed on the sexual harassment claim. The district court also determined that the jury had not made the findings required under state law to support a punitive award greater than $500,000. Accordingly, the Amended Judgment noted that Myers "shall take nothing" on the Title VII and FCRA claims, and reflected that the district court had reduced the punitive damage award by $4,776,640. Adjusted for interest, the compensatory damages were listed as $103,622.09 and the punitive damages as $506,847.75 for a total award of $610,469.84. There was no award of attorneys' fees.

This timely appeal and cross-appeal followed.

_____

[3] The statute of limitations for battery is four years in Florida. <u>See</u> Fla. Stat. § 95.11(3)(o). Myers first asserted battery in her counterclaim filed May 19, 2004.

## II. Standard of Review

First, the defendants argue that Florida law cannot support a compensatory award of this size on this record. They also challenge the punitive award under state law, asserting first that punitive damages are not permitted, and, in the alternative, that the punitive damages were too great. They also maintain that the punitive damage award violates the federal Constitution.

Myers claims, in turn, first that the district court improperly applied Florida's statutory cap on punitive damages, thereby wrongfully reducing the punitive award to $500,000 when the evidence could support greater damages. Second, she says that the defendants had the burden of showing that their unlawful behavior occurred before September 15, 2000, the relevant date under the statute of limitations. Third, she states that the district court, during rebuttal, improperly prevented her from putting on evidence that the defendants sexually harassed her on or after September 15, 2000; this evidence, she claims, would prove that her suit was timely. Fourth, she asserts that she should be considered a prevailing party under Title VII, and is therefore entitled to attorney's fees under the statute. Fifth, and finally, she argues that it was reversible error for the district court to dismiss, rather than remand a number of state law claims over which the court had declined to exercise supplemental jurisdiction.

16

A number of standards govern review of the questions raised in this case. We review for abuse of discretion the propriety of the compensatory award under Florida law, see Bogle v. McClure, 332 F.3d 1347, 1359 (11th Cir. 2003) (citation omitted), the district court's application of state statutory law to a jury award, Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 280 (1989); Johansen v. Combustion Eng'g, Inc., 170 F.3d 1320, 1334 n.28 (11th Cir. 1999); see also Engle v. Liggett Group, Inc., 945 So.2d 1246, 1263 (Fla. 2006), the district court's limitation of rebuttal, Conroy v. Abraham Chevrolet-Tampa, Inc., 375 F.3d 1228, 1232 (11th Cir. 2004), and the district court's refusal to exercise supplemental jurisdiction over state law claims. Raney v. Allstate Ins. Co., 370 F.3d 1086, 1088-89 (11th Cir. 2004) (citation omitted).

We review for clear error, however, the district court's findings of fact, Johansen, 170 F.3d at 1334; Head v. Medford, 62 F.3d 351, 354 (11th Cir. 1995), and the district court's determination that parties have met the pleading requirements concerning the fulfillment of conditions precedent under Rule 9 of the Federal Rules of Civil Procedure. Fitz-Patrick v. Commonwealth Oil Co., 285 F.2d 726, 730 (5th Cir. 1960).[4]

---

[4] Cases decided by the Fifth Circuit prior to the close of business on September 30, 1981, are binding on this Court. See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

17

Finally, we review de novo the propriety of punitive damages, Goldsmith v. Bagby, 513 F.3d 1262, 1275 (11th Cir. 2008) (citation omitted), the constitutionality of a punitive award, Johansen, 170 F.3d at 1334; see also id. at 1331 ("[A] court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause.") (citation omitted), and whether a party has prevailed under federal law. Head v. Medford, 62 F.3d 351, 354 (11th Cir. 1995).

### III.  Compensatory Damages

The jury awarded $102,223.14 in compensatory damages to Myers on her battery count, and the district court accordingly entered judgment for Myers in that amount.  CFI and Siegel challenge this award under Florida law, asserting both that the size of the award is too great for what they claim is an ordinary battery, and that the specific amount, which is equal to Myers' earnings during the year of her discharge, demonstrates that the jury inappropriately considered her termination during deliberations.  We are unpersuaded.

A federal court reviewing a compensatory award on a state law claim must evaluate the propriety of the award under state law.  See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 435 (1996) (citation omitted); Johansen, 170 F.3d at 1331.  Under Florida law, jury awards are evaluated under a five-factor test:

18

In determining whether an award is excessive or inadequate in light of the facts and circumstances presented to the trier of fact and in determining the amount, if any, that such award exceeds a reasonable range of damages or is inadequate, the court shall consider the following criteria:

(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;

(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;

(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture;

(d) Whether the amount awarded bears a reasonable relation to the amount of damages proved and the injury suffered; and

(e) Whether the amount awarded is supported by the evidence and is such that it could be adduced in a logical manner by reasonable persons.

Fla. Stat. § 768.74(5). Taking each factor in turn, we hold that the district court did not abuse its discretion in upholding the jury's award of compensatory damages.

The first factor asks whether the award evinces passion or prejudice. The district court cited Goldsmith v. Bagby, 513 F.3d 1262, 1275 (11th Cir. 2008), to show the validity of an emotional damages award equal to a claimant's salary. See Myers v. Cent. Fla. Invs., Inc., No. 6:04-cv-1542-Orl-28DAB, 2008 WL 4710898, at *15 n.13 (M.D. Fla. Oct. 23, 2008). But the validity of the compensatory award

was not at issue in Goldsmith, see 513 F.3d at 1267-68, 1276-77, and, as the defendants argue, its relevance to our inquiry is therefore limited.  Cf. Bravo v. United States, 532 F.3d 1154, 1166-67 (11th Cir. 2008) (holding that damages are to be compared only against awards tested for size in reported appellate decisions), reh'g denied, 583 F.3d 1294 (2009).

Defendants are also correct to note that the jury was prohibited from awarding Myers money for her termination.  See Myers, 237 F. Appx. at 457 ("Myers cannot sustain a viable retaliation claim.").  Indeed, the district court expressly gave the jury instructions to this effect.  Nevertheless, CFI and Siegel have failed to convince us that the compensatory award for emotional damages equal to a claimant's annual income evinces prejudice, passion or corruption on the part of the jury.

A jury instructed to consider compensatory damages for emotional harm is asked to place a dollar amount on one person's suffering.  The inquiry is inherently subjective, see Ferrill v. Parker Group, Inc., 168 F.3d 468, 476 (11th Cir. 1999), as jurors bring their own experiences to bear on another person's humiliation, discomfort, and shame.  The objective -- to make a plaintiff whole, see Sheely v. MRI Radiation Network, P.A., 505 F.3d 1173, 1199-1200 (11th Cir. 2007) -- plainly is a difficult one, cf. Williams v. Trans World Airlines, Inc., 660 F.2d 1267,

20

1273 (6th Cir. 1981) ("[I]t is admittedly difficult to place a value upon the resulting emotional injury from the deprivation of a constitutional right."), and the means employed are far from perfect. Cf. Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003, 1009 (2d Cir. 1995) ("[C]ompensation for suffering can be accomplished only in a symbolic and arbitrary fashion."). But we will not prohibit jurors from considering a legitimate measure as they go about their task.

A plaintiff's income is relevant insofar as it affords some indication, however imprecise, of the costs imposed on an employee whose time in the workplace is inundated and spoiled by a defendant's behavior. Many of the touchings described by Myers, particularly the two incidents during which Siegel pinned her against the wall in the spa, occurred in 2000, the year in which Myers earned $102,223.14 from CFI. She testified that Siegel's behavior during this period humiliated her in front of her coworkers and drained her of her desire to go to work. In attempting to set a dollar amount that would properly compensate her for emotional suffering, the jury was permitted to consider, among other things, her salary for the time in which she was subjected to the unlawful behavior. Her salary at the very least gives some indication to the jury as to how Myers valued her time at work, from which they may properly infer the amount of emotional suffering that flowed from those workplace batteries. To hold otherwise, and deprive juries

21

of resort to income, would make the jury's difficult task that much more improbable.

The second statutory factor asks whether the jury ignored evidence or misconceived the merits of the case. As we have noted, the jury was permitted to conclude that several instances of battery occurred on or after May 21, 2000, the statutory cutoff. There is no reason to believe that a jury which has discounted the testimony of defense witnesses and the explanations of defense counsel has misapprehended a case. Cf. Bogle, 332 F.3d at 1359 ("The standard of review for awards of compensatory damages for intangible, emotional harm is deferential to the fact finder because the harm is subjective and evaluating it depends considerably on the demeanor of the witnesses.") (quotation marks and citations omitted).

Florida's third statutory factor asks whether improper elements were considered, or if the verdict was based on conjecture. Defendants argue that emotional damages were never proven by medical testimony. But emotional damages need not be supported by medical testimony in Florida. See Hagan v. Coca-Cola Bottling Co., 804 So.2d 1234 (Fla. 2001). Defendants also say that no reasonable jury could award $100,000 for a single battery, and that the award, therefore, took into account incidents unrelated to the battery, including time-

22

barred material.  Even if we were to assume that the jury did consider material external to the battery itself, we conclude that the award may still stand.  Under Florida law, a tortfeasor is liable for the "entire unapportionable injuries" sustained by a plaintiff, even if those injuries were heightened by prior incidents for which the defendant cannot be held liable.  Cf. Gross v. Lyons, 763 So.2d 276, 279 (Fla. 2000) (noting that "subsequent tortfeasors have been liable for entire unapportionable injuries"); C.F. Hamblen, Inc. v. Owens, 172 So. 694, 696 (Fla. 1937) ("It is settled law that where injuries aggravate an existing ailment or develop a latent one the person whose negligence caused the injury is required to respond in damages for the results of the disease as well as the original injury.").  The jury was permitted to consider the role the sexual harassment and prior batteries played in heightening the damages flowing from this battery, even if that behavior was itself time-barred.  Cf. Stockett v. Tolin, 791 F. Supp. 1536, 1556-57 (S.D. Fla. 1992) (stating that a plaintiff's "pre-existing" vulnerability, or "greater sensitivity, . . . does not warrant any reduction in her recovery.  The Defendants must take the plaintiff as they find her") (citations omitted).

The fourth statutory factor asks whether the award is reasonably related to the damages suffered.  This compensatory award of a little over $100,000 is not so great as to bear no reasonable relation to the damages she suffered.  See Baldwin v.

23

McConnell, 643 S.E.2d 703, 705-06 (Va. 2007) (approving a $100,000 compensatory award for assault and battery); Nash v. Sue Har Equities, LLC, 846 N.Y.S.2d 215, 216 (N.Y. App. Div. 2007) (awarding $100,000 for assault). Furthermore, since this battery involved a boss plainly taking advantage of his employee over an extended time frame, we can tolerate damages which may be higher than normal. Cf. Stockett v. Tolin, 791 F. Supp. 1536, 1555 n.4 (S.D. Fla. 1992) ("[C]ases in which a supervisor has conducted a continued course of sexual advances and harassment, followed by refusals by the employee, and retaliation by the supervisor in the form of denying promotions or making the atmosphere of the work place oppressive, involved conduct that is . . . outrageous.") (quoting Fawcett v. IDS Financial Svcs., Inc., No. 85-853, 1986 WL 9877, at *5 (W.D. Pa. Jan. 7, 1986)); Hughston v. New Home Media, 552 F. Supp.2d 559, 567 (E.D. Va. 2008) ("There can be few more insulting injuries than being subjected to unwelcome sexual touchings by a supervisor, accompanied by lewd solicitations for sex, in the workplace.").

The fifth and final statutory factor asks whether the award is supported by evidence and can be logically adduced by reasonable people. For all the reasons outlined above -- the existence of the battery, the existence of prior harassment and touchings that might have heightened damage flowing from the battery, and the

24

superior-subordinate relationship of Siegel and Myers -- this award is supported by the evidence and appears to be the result of a logical process conducted by reasonable people.

Since the compensatory award falls within a range of damages reasonable under Florida law, it does not constitute a clear abuse of discretion for the district court to let it stand. Cf. Fla. Stat. § 768.74(6) ("The Legislature recognizes that the reasonable actions of a jury are a fundamental precept of American jurisprudence and that such actions should be disturbed or modified with caution and discretion."). Defendants are correct that a smaller award would have been reasonable, too, but this award is entitled to a presumption of validity, see Bogle, 332 F.3d at 1359, and they have failed to overcome that presumption.

## IV. Punitive Damages

The jury awarded $5,276,640 to Myers in punitive damages flowing from the battery count, but the district court, relying on the Florida statutory cap on punitive damages, reduced the award to $500,000. This capped award was then adjusted for interest, resulting in the $506,847.75 award.

A.  Florida Law

The defendants challenge the punitive award under Florida law, arguing that punitive damages should not have been allowed at all, and, in the alternative, that

25

the award was excessive. Myers contends that the district court was not empowered to reduce the award absent a proper motion from defendants, which she contends was not made.

Florida law provides that:

A defendant may be held liable for punitive damages only if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence. As used in this section, the term:

(a) "Intentional misconduct" means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage.

Fla. Stat. § 768.72(2). Decades of Florida case law have made it clear that a finding of battery is sufficient to trigger punitive damages. See, e.g., Canseco v. Cheeks, 939 So.2d 1122, 1123 (Fla. Dist. Ct. App. 2006) ("[I]ntentional battery supplies the requisite proof of malice, justifying a punitive damages award.") (citations omitted); see also Joab, Inc. v. Thrall, 245 So.2d 291, 293 (Fla. Dist. Ct. App. 1971) ("In Florida it is clear that an act of intentional assault and battery committed without legal justification supplies proof of malice.").[5] Inasmuch as the Florida courts have on this issue been unequivocal, the district court did not err by

---

[5] While the Supreme Court of Florida has never stated this rule, we may rely on the interpretation of a state's intermediate courts absent some indication from the state's highest court to the contrary. See Galindo v. ARI Mut. Ins. Co., 203 F.3d 771, 775 (11th Cir. 2000).

allowing punitive damages here.

The district court was empowered, however, to remit the award if it determined that it was unreasonable. See id. § 768.73(1)(d). The factors the trial court is obliged to consider when assessing the excessiveness of a punitive award are the same factors it must consider when assessing the amount of a compensatory award. See id. § 768.74(5). In Florida, the courts must conduct this review in order "to make certain that the manifest weight of the evidence does not render the amount of punitive damages assessed out of all reasonable proportion to the malice, outrage, or wantonness of the tortious conduct." Engle v. Liggett Group, Inc., 945 So. 2d 1246, 1263 (Fla. 2006).

"Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future." Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483, 486 (Fla. 1999). The Supreme Court of Florida, therefore, has determined that the wealth of the defendant is a factor for consideration in determining the reasonableness of a punitive award: "an award must be reviewed to ensure that it bears some relationship to the defendant's ability to pay and does not result in economic castigation or bankruptcy of the defendant." Engle, 945 So. 2d at 1263; see also Rinaldi v. Aaron, 314 So. 2d 762, 764 (Fla.

1975); <u>St. John v. Coisman</u>, 799 So. 2d 1110, 1115 (Fla. Dist. Ct. App. 2001). While it is not "an accurate rule of law that the greater a defendant's wealth, the greater must be punitive damages," <u>Bankers Multiple Line Ins. Co. v. Farish</u>, 464 So. 2d 530, 533 (Fla. 1985), a "jury may properly punish each wrongdoer by exacting from his pocketbook a sum of money which, according to his financial ability, will hurt, but not bankrupt." <u>Bould v. Touchette</u>, 349 So. 2d 1181, 1186-87 (Fla. 1977).

This punitive award of $500,000 does not offend Florida Statute § 768.74(5). Given the many years during which Siegel touched and harassed Myers in the workplace, his repeated and public humiliations of her, and his refusal to desist despite her repeated requests, the award can hardly be said to evince passion, prejudice, or corruption. The award does not reveal that the court ignored evidence or considered improper elements, nor is the award otherwise illogical. Simply stated, the trial court could find that the $500,000 punitive award bore a reasonable relation to the damage that would flow from a battery preceded by so much sexual misconduct in the workplace.

Furthermore, the punitive damage award would not result in the economic castigation or bankruptcy of the defendants. The district court heard testimony that CFI's net worth exceeded $471,000,000 and Siegel's $324,000,000. Since

28

defendants' ability to pay the original $5,378,863.14 judgment is, by their own post-trial admission, plain, the amended $500,000 punitive award cannot be said to bear an unreasonable relationship to their ability to pay.

Under Florida law, punitive damages also are subject to a statutory cap, and Myers asserts that it was improperly applied here. Section 768.73(1)(a) of the Florida Statutes provides that "an award of punitive damages may not exceed the greater of: 1. Three times the amount of compensatory damages awarded to each claimant entitled thereto, consistent with the remaining provisions of this section; or 2. The sum of $500,000." But there are statutory exceptions to this general rule, one of which provides that, "[w]here the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant's conduct did in fact harm the claimant, there shall be no cap on punitive damages." Id. § 768.73(1)(c). In other words, in order for a punitive award greater than $500,000 to stand, a Florida jury must have found both specific intent to harm and actual harm.

There is no question that the jury did not make any such overt findings. The jury answered eight questions on the verdict form,[6] none of which addressed

---

[6] The interrogatories answered by the jury were these:

Claim One
Do you find from a preponderance of the evidence:

specific intent to harm or actual harm. However, the inquiry does not end there.

The jury verdict is considered alongside the jury instructions, and if the two can be

read together to show that the jury made the required findings, then a heightened

award may still stand. Cf. McNely v. Ocala Star-Banner Corp., 99 F.3d 1068,

1072 (11th Cir. 1996) (stating that the sufficiency of jury instructions should be

evaluated in light of the jury verdict).

The district court's instructions to the jury regarding battery read this way:

---

1. That Plaintiff Georgette Myers was an independent contractor? No . . .
2. That Plaintiff Georgette Myers was an employee of any of the following business entities? . . .

| | |
|---|---|
| Central Florida Investments, Inc. | Yes |
| CFI Sales and Marketing, Ltd. | Yes |
| Westgate Resorts, Inc. | Yes |
| Westgate Resorts, Ltd. | Yes |

3. That David Siegel subjected the Plaintiff to a hostile or abusive work environment because of her sex or gender? Yes . . .
4. That at least one of the acts of sexual harassment took place on or after September 15, 2000? No . . .

Claim Two
7. Do you find from a preponderance of the evidence that Defendant David Siegel committed battery against Plaintiff? Yes . . .
8. Do you find from a preponderance of the evidence that conduct constituting battery occurred on or after May 21, 2000? Yes . . .
9. Do you find from a preponderance of the evidence that Plaintiff should be awarded compensatory damages on the battery claim? Yes. If Yes, in what amount? $102,223.14 . . .
10. Do you find by clear and convincing evidence that punitive damages should be awarded on the battery claim? Yes. If Yes, in what amount, based on a preponderance of the evidence? $5,276,640.00 . . .

The jury did not reach questions five and six, which concerned damages for sexual harassment, because it answered question four in the negative.

30

A battery is an intentional infliction of harmful or offensive contact upon the person of another. To prevail on her battery claim, the Plaintiff must prove each of the following facts by a preponderance of the evidence:

> First: That David Siegel intended to touch the Plaintiff's person;
>
> Second: That David Siegel actually touched the Plaintiff against her will; and
>
> Third: That the contact was harmful or offensive to the Plaintiff.

There is no natural reading of the verdict alongside the instructions that yields the conclusion that the jury made the requisite findings. As the instructions make clear, a civil battery might be supported where a defendant had specific intent to offend, not harm, and where the defendant effected an offensive, but not harmful, contact. See Paul v. Holbrook, 696 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1997). Therefore, it can hardly be said that the findings of specific intent to harm and actual harm inhere in a jury verdict of civil battery.

The district court did make passing reference to the twin requirements when issuing instructions on punitive damages, encouraging the jury to "consider . . . whether, at the time of the injury or damage, David Siegel had a specific intent to harm the Plaintiff and the conduct of David Siegel did in fact harm the Plaintiff." Yet the court never instructed the jury that it must find specific intent to harm or

31

actual harm.

Furthermore, the district court was entitled to apply the statutory cap of its own volition: "where a portion of a verdict is for an identifiable amount that is not permitted by law, the court may simply modify the jury's verdict to that extent and enter judgment for the correct amount." Johansen, 170 F.3d at 1330 (citing New York, L. E. & W. R. Co. v. Estill, 147 U.S. 591 (1893)); see also Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989). Because the Florida statute does not require a motion by the aggrieved party, see Fla. Stat. § 768.73(1)(a), we need not consider whether the defendants properly moved for application of the statutory cap.

B.     Constitutional Law

The defendants also challenge the constitutionality of the $500,000 punitive award, asserting that they did not have fair notice that they might be liable to pay a punitive award so much greater than the compensatory award.

The foundation of the due process inquiry is found in B.M.W. of North America, Inc. v. Gore, 517 U.S. 559 (1996). "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." Id. at 574. While "[p]unitive

32

damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition," id. at 568 (citations omitted), and states "have considerable flexibility in determining the level of punitive damages that they will allow," id., an award runs afoul of the due process clause when it "can fairly be categorized as 'grossly excessive' in relation to these interests," id. (quoting TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 454 (1993)). To help determine when an award is grossly excessive, the Supreme Court has adopted three guideposts for a court's consideration: "the degree of reprehensibility" of the defendant's actions; "the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." Id. at 574-75.

Proper due process analysis of a punitive award in the Eleventh Circuit "requires first that we identify the state's interest in deterring the relevant conduct and the strength of that interest. Next, we review the district court's findings regarding the three BMW guideposts." Johansen, 170 F.3d at 1335. While we are "mindful of the difficulty of our task," id. at 1333 n.22 (citing Gore, 517 U.S. at 606 (Scalia, J., dissenting)), we are guided by the understanding that the constitutional question ultimately hinges on whether a defendant "had adequate

33

notice that its conduct might subject it to this punitive damage award." Id. at 1335; see also Action Marine, Inc. v. Cont'l Carbon, Inc., 481 F.3d 1302, 1318 (11th Cir. 2007) ("We do not view these guideposts as an analytical straitjacket, and we maintain as our overarching aim eliminating the risk that a defendant is punished arbitrarily or without fair notice of the possible consequences of its actions.") (quotation marks and citations omitted).

The state's interest in deterring defendants' conduct is strong. As the Supreme Court of Florida has stated:

> There can be no doubt at this point in time that both the state of Florida and the federal government have committed themselves strongly to outlawing and eliminating sexual discrimination in the workplace, including the related evil of sexual harassment. The statutes, case law, and administrative regulations uniformly and without exception condemn sexual harassment in the strongest possible terms.

Byrd v. Richardson-Greenshields Secs., Inc., 552 So. 2d 1099, 1102 (Fla. 1989). Furthermore, the state's interest in protecting workers from sexual discrimination extends to both statutory and common law claims: "Public policy now requires that employers be held accountable in tort for the sexually harassing environments they permit to exist, whether the tort claim is premised on a remedial statute or on the common law." Id. at 1104.

There is no question that Florida has a considerable interest in protecting

34

workers from the kind of sexual misconduct to which Myers was subjected for so many years. The jury found a battery by a superior on an employee in the workplace. This battery followed a long period during which Siegel and CFI subjected Myers to sexual harassment, but for which recovery was barred by the statute of limitations. Furthermore, Myers' repeated complaints, both to Siegel and other CFI executives, were ignored and rebuffed. This unchecked pattern of "antisocial behavior" from Siegel and CFI underscores the need for punitive damages as a means "to correct evil-doing in areas not covered by the criminal law." See Campbell v. Gov't Employees Ins. Co., 306 So. 2d 525, 531 (Fla. 1974).

With awareness of the powerful state interests in play, we turn next to the Gore guideposts. The first is the degree of reprehensibility, and it is "the most important indicium." State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 419 (2003); see also Goldsmith, 513 F.3d at 1283 (calling the first prong the "dominant consideration"). The Supreme Court, in State Farm, identified five specific factors for consideration:

> We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

35

538 U.S. at 419; see also Goldsmith, 513 F.3d at 1283 (citing EEOC v. W&O, Inc., 213 F.3d 600, 614-15 (11th Cir. 2000)). While there is no requirement that a certain number of the five State Farm factors be present in order to support a finding of reprehensibility, reprehensibility grows more likely as more factors are present. See State Farm, 538 U.S. at 419.

The district court took each State Farm factor in turn. On the first factor, the court noted that "the harm here was emotional rather than economic." Myers, 2008 WL 4710898 at *17. As the jury heard evidence that Myers felt upset, embarrassed, humiliated, and degraded by Siegel's actions at CFI, this finding of fact does not constitute clear error.

On the second factor, the district court noted that "there is some disregard of health at play insofar as Plaintiff's emotional health was involved." Id. Since there was plenty of evidence here, concerning both the battery and the sexual harassment, suggesting an indifference or reckless disregard towards Myers' health, whether physical or emotional, it was not clear error for the district court to so find.

On the third factor, the district court found that the employment relationship mattered: "financial vulnerability is implicated somewhat because, although this battery claim did not involve financial consequences for Plaintiff per se, the events

36

did occur in the workplace and Plaintiff's boss -- who controlled Plaintiff's earnings -- was the one who committed the acts." Id. Myers presented evidence that she feared making too big a deal of the touchings and harassment because Siegel was her boss and she did not want to lose her job. She testified that she stayed at CFI in part because she needed the money, and because she knew that her chosen industry would not be as kind to a person without a college degree as had been CFI. The district court's determination, therefore, that the superior-subordinate relationship between Siegel and Myers injected a sense of financial vulnerability into their interactions cannot constitute clear error. Cf. Stockett v. Tolin, 791 F. Supp. 1536, 1555 n.4 (S.D. Fla. 1992); Hughston v. New Home Media, 552 F. Supp.2d 559, 567 (E.D. Va. 2008).

On the fourth factor, the district court wrote, "there is some evidence of repeated actions, though only a six-month time period is at issue." Myers, 2008 WL 4710898 at *17. We note, however, that a jury may consider material external to the charge in determining the reprehensibility of the charge itself. See Gore, 517 U.S. at 576-77 ("Certainly, evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law.") (citing TXO, 509 U.S. at 462 n.28); State

37

Farm, 538 U.S. at 423 (noting the relevance to the reprehensibility inquiry of similar "prior transgressions") (citing TXO, 509 U.S. at 462 n.28); Johansen, 170 F.3d at 1333 (similar). Moreover, "evidence of other acts need not be identical to have relevance in the calculation of punitive damages." State Farm, 538 U.S. at 423-24.

In this case, there was voluminous evidence of repetition presented to the jury. Myers described a pattern of sexual touching from Siegel beginning in 1995 and ending in 2000. He touched her in the office, in the restaurant, in the spa, in the treatment room, and on the dance floor. He touched her legs, her behind, and her shoulders. He touched her when they were alone and when other CFI employees were around. While these touchings were not all identical, it did not constitute clear error for the district court to determine that the battery for which defendants were held liable "replicate[d] the prior transgressions." Cf. id. at 423 (citing TXO, 509 U.S. at 462 n.28). The district court's only error was the suggestion that the similar prior transgressions that are time-barred are in no way relevant to the reprehensibility inquiry; such a conclusion does not flow from our precedents. See Gore, 517 U.S. at 576-77; State Farm, 538 U.S. at 423 (citing TXO, 509 U.S. at 462 n.28); Johansen, 170 F.3d at 1333.

On the fifth and final factor, the district court noted that "battery is an

38

intentional tort, although malice is not required for its commission." Myers, 2008 WL 4710898 at *17. Inasmuch as battery in Florida can be sustained by an intent to do mere offense, see Paul v. Holbrook, 696 So. 2d 1311, 1312 (Fla. Dist. Ct. App. 1997), the district court's determination that intentional malice was not present is not clearly erroneous.

After the analysis of the State Farm factors, the district court turned to Gore and concluded that "Mr. Siegel's conduct is at the low to middle range of the reprehensibility scale." Id. This is a factual finding, see Johansen, 170 F.3d at 1334, for which the district court is allowed in its discretion to weigh the severity of each factor, see State Farm, 538 U.S. at 419. In light of the ample evidence that Myers suffered emotional distress, that she decided to stomach the objectionable conduct for fear of losing her job and her income, that the behavior persisted for years and over her frequent objections, and that no one at CFI seemed to care, we cannot say that the district court's conclusion regarding reprehensibility is clearly erroneous.

The second Gore guidepost is the ratio of punitive damages to actual harm inflicted on the plaintiff. The "proper inquiry is whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." Gore, 517

39

U.S. at 581 (citing TXO, 509 U.S. at 460) (emphasis in original) (quotation marks omitted). On this issue, "comparison between the compensatory award and the punitive award is significant." Id. at 581 (citing TXO, 509 U.S. at 459; Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991)). In particular, the ratio of punitive to compensatory damages is instructive. See State Farm, 538 U.S. at 425. Nevertheless, the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award." Gore, 517 U.S. at 582 (citing TXO, 509 U.S. at 458); see also State Farm, 538 U.S. at 425; Goldsmith, 513 F.3d at 1283.

In this case, the amended judgment set punitive damages at $506,847.78 and compensatory damages at $103,622.09. Since this yields a ratio of punitive to compensatory damages of approximately 4.89:1, the district court's finding that the ratio was "less than 5 to 1," Myers, 2008 WL 4710898 at *17, is not clearly erroneous. Cf. Johansen, 170 F.3d at 1334 ("[T]he ratio of the actual to the punitive damages is an historical fact. We accept that finding unless it is clearly erroneous."). The district court then concluded that "[t]his ratio does not suggest an excessive award." Myers, 2008 WL 4710898 at *17.

Notably, this Court has approved of a number of punitive awards where the

40

ratio of punitive to compensatory damages exceeded 4.89:1.  See Johansen, 170 F.3d at 1327, 1339 (ratio of 100:1); Goldsmith, 513 F.3d at 1283, 1285 (ratio of 9.2:1); U.S. EEOC v. W&O, Inc., 213 F.3d 600, 616-17 (11th Cir. 2000) (ratio of 8.3:1); Action Marine, Inc. v. Cont'l Carbon, Inc., 481 F.3d 1302, 1321, 1323 (11th Cir. 2007) (ratio of 5.5:1); see also Bogle v. McClure, 332 F.3d 1347, 1362 (11th Cir. 2003) (ratio of 3.8:1).  Furthermore, on the one occasion where this Court has struck down a punitive award for constitutional excess, it reduced an award with a ratio of 8,692:1 to an award with a ratio of 2,173:1.  See Kemp v. Am. Tel. & Tel. Co., 393 F.3d 1354, 1365 (11th Cir. 2004) (reducing the punitive award from $1,000,000 to $250,000 when compensatory damages amounted to $115.05).  Those cases, like this one, implicated powerful state interests, from protection of the environment, see Johansen, 170 F.3d at 1339; Action Marine, 481 F.3d at 1319, to the elimination of workplace discrimination, see Goldsmith, 513 F.3d at 1267; EEOC v. W&O, 213 F.3d at 607; Bogle, 332 F.3d at 1350, to the protection of consumers, see Kemp, 393 F.3d at 1357.

Again, the state interest in protecting employees from repeated offensive sexual touchings by the boss in the workplace is strong.  Furthermore, the $506,847.75 punitive award bears a reasonable relationship both to the harm Myers has suffered and to the harm likely to result should CFI not be penalized now.  The

district court, therefore, did not err in determining that the punitive ratio of 4.89:1 does not offend constitutional due process.

Defendants urge, nevertheless, that under Exxon Shipping Co. v. Baker, 128 S. Ct. 2605 (2008), any ratio greater than 1:1 is constitutionally suspect. Their reliance on Exxon is misplaced. In Exxon, the Supreme Court was quite explicit that it was dealing with maritime law, and not due process of law. See, e.g., id. at 2626 ("Today's enquiry differs from due process review because the case arises under federal maritime jurisdiction, and we are reviewing a jury award for conformity with maritime law, rather than the outer limit allowed by due process . . . ."); id. at 2626-27 ("Our review of punitive damages today, then, considers not their intersection with the Constitution, but the desirability of regulating them as a common law remedy for which responsibility lies with this Court as a source of judge-made law in the absence of statute."). Defendants' suggestion that the punitive award violates the Constitution of the United States can therefore find no support in Exxon.

The third and final Gore guidepost is a comparison between "the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at 583. When considering criminal penalties, a reviewing court considers both fines and imprisonment. See Pacific Mut. Life Ins.

42

Co. v. Haslip, 499 U.S. 1, 23 (1991); see also Gore, 517 U.S. at 583 (citing Haslip, 499 U.S. at 23). These peripheral sanctions are significant because they can serve to give fair notice to potential tortfeasors of the magnitude of sanctions they might face for their actions. See Gore, 517 U.S. at 584; Johansen, 170 F.3d at 1337.

The third guidepost presents a mixed question of law and fact:

> [T]he selection of the most appropriate point of comparison -- actual fine imposed, the maximum possible penalty or penalties in similar cases -- is an issue of law. We, therefore, review the district court's determination of the appropriate comparison de novo. However, the district court's finding regarding this comparison, i.e., the disparity between the amount of the punitive damages award and the amount of the other civil or criminal sanctions, is an historical fact which we review for clear error.

Johansen, 170 F.3d at 1334.

The district court determined that Florida's statutory cap on punitive damages was the most appropriate comparison point. See Myers, 2008 WL 4710898 at *18. This was error. The fact that some torts can be punished up to $500,000 does not put people on notice that battery might be punished up to $500,000. Rather, the district court should have compared the punitive award to the sanctions available for a criminal battery.[7]

However, even after determining that the district court applied the wrong

---

[7] Under Florida law, the criminal "offense of battery occurs when a person: 1. Actually and intentionally touches or strikes another person against the will of the other; or 2. Intentionally causes bodily harm to another person." Fla. Stat. § 784.03(1)(a).

comparison point, we still ultimately affirm its conclusion. We do so because the proper comparison point did provide unambiguous notice to the defendants of the seriousness of their tort. Battery is a crime in Florida punishable by up to a year in prison, see Fla. Stat. §§ 784.03(1), 775.082(4)(a), 775.083(1)(d), which is a serious criminal sanction.[8] The due process clause is violated when defendants do not have fair notice of the magnitude of the punitive sanctions they might face. Because battery can carry a prison term of a year, residents of Florida have fair notice that battery is an offense with formidable consequences. A $500,000 punitive award fits comfortably within this array of potential sanctions.

As a final matter, under controlling case law, the courts of this Circuit are empowered to consider the financial resources of the defendant when determining the constitutionality of an award. See Johansen, 170 F.3d at 1338; W&O, 213 F.3d at 616-17 (similar); Kemp, 393 F.3d at 1364. Undeniably, the $500,000 punitive award is a serious sanction and may not be taken lightly. It will not, however, bankrupt or cripple these wealthy defendants. Moreover, the trial judge could readily find that a lesser award would not provide the same level of deterrence.

We can discern nothing to suggest that the punitive award in this case is in any way violative of the Constitution. Siegel engaged in a pattern of offensive

_____

[8] As Myers argues, Siegel, with a net worth of $324,000,000, would likely pay $500,000 to avoid a year in prison.

44

sexual touchings in the workplace, heaping upon Myers, his subordinate, indignities both private and public. CFI, alerted to Siegel's abhorrent behavior on numerous occasions by Myers, did nothing to stop it, and even in some instances encouraged it. It can hardly be said that the defendants did not have fair notice that years of such behavior -- culminating in the battery for which they were found liable -- might expose them to a substantial punitive damages award. The jury and the district court, after hearing extended testimony, plainly meant for the defendants to understand that their conduct towards Myers was wholly unacceptable and that it would be punished in a substantial manner. Ultimately, the Constitution permits the district court to fashion a punitive remedy that will effectively deliver this message.

## V. Statute of Limitations

Because Myers filed her complaint with the EEOC on September 14, 2001, the defendants could only be held liable for sexual harassment that had occurred on or after September 15, 2000, under the FCRA, see Fla. Stat. § 760.11(a), and on or after November 19, 2000, under Title VII. See 42 U.S.C. 2000e-5(e); City of Hialeah, Fla. v. Rojas, 311 F.3d 1096, 1101 (11th Cir. 2002). Nevertheless, Myers presented little testimony during her case-in-chief concerning when the complained-of behavior occurred. While her witnesses described much harassing

45

conduct, they did not state clearly when it had occurred, or if any had occurred after September 15, 2000. Nor did the defendants put on evidence regarding when the events described by Myers' witnesses purportedly occurred. When, during rebuttal, Myers attempted to develop testimony that would show that some harassment had indeed occurred after September 15, 2000, the district court did not allow it. Myers argues, nevertheless, that her failure to put on evidence of timeliness should not preclude her from recovery under Title VII and the FCRA, because it was the defendants who bore the burden of proving that their conduct occurred before the relevant dates, and because they failed to discharge that burden.

The filing of a complaint with the EEOC is a condition precedent to a sexual harassment suit. See Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001); see also 42 U.S.C. § 2000e-5(b). A harassment suit may go forward under some circumstances, however, if the plaintiff has failed to do so, because "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); see also Weaver v. Casa Gallardo, Inc., 922 F.2d 1515, 1521 (11th Cir. 1991).

"In pleading conditions precedent, it suffices to allege generally that all conditions precedent have occurred or been performed.  But when denying that a condition precedent has occurred or been performed, a party must do so with particularity."  Fed. R. Civ. P. 9(c).  Should a defendant make that denial, "[t]he plaintiff then bears the burden of proving that the conditions precedent, which the defendant has specifically joined in issue, have been satisfied."  Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1010 (11th Cir. 1982).  Should a defendant "not deny the satisfaction of the conditions precedent specifically and with particularity, however, the allegations are assumed admitted and cannot later be attacked."  Id. at 1009.

In this case, the ninth paragraph of Myers' Second Amended Complaint addressed conditions precedent.  It read: "Plaintiff received her Notice of Right to Sue letter from the U.S. Equal Employment Opportunity Commission within 90 days before filing this action, and has otherwise fulfilled all conditions precedent to institution of this action."  This general statement from Myers was sufficient to discharge her duty under Rule 9 of the Federal Rules of Civil Procedure.  See EEOC v. Times-Picayune Publ'g Corp., 500 F.2d 392, 392 (5th Cir. 1974).[9]  We

---

[9] Opinions of the Fifth Circuit rendered before the close of business on September 30, 1981, are binding on this Court.  See Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

47

consider, then, the sufficiency of any denials interposed by the defendants.

Defendants' first denial consisted of the following: "Defendants deny the allegations contained in paragraph 9 of the Plaintiff's Second Amended Complaint." Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at 2, Myers v. Cent. Fla. Invs., Inc., No. 6:04-cv-1542-Orl-28DAB (M.D. Fla. Oct. 25, 3005). This is as general as a denial can be, and therefore cannot meet the particularity requirements of Rule 9 of the Federal Rules. See, e.g., Wilshin v. Allstate Ins. Co., 212 F.Supp.2d 1360, 1370 (M.D. Ga. 2002).

However, paragraph nine was not the only place in the Answer where defendants addressed the fulfillment of conditions precedent. In a section concerning affirmative defenses appeared the following:

338. Plaintiff failed to exhaust all administrative remedies and thus cannot obtain relief pursuant to Title VII or the Florida Civil Rights Act, Chapter 760.

339. Plaintiff did not exercise her right to sue or to file her EEOC Complaint within the time prescribed by the statute.

Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint at 32, Myers, No. 6:04-cv-1542-Orl-28DAB (M.D. Fla. Oct. 25, 3005). These paragraphs state which particular condition precedent they claim Myers failed to fulfill (the EEOC complaint), and the reason for the failure (untimeliness). The denial is sufficiently particular.

While affirmative defenses are, of course, distinct from denials, see, e.g., In re Rawson Food Service, Inc., 846 F.2d 1343, 1349 (11th Cir. 1988), and while Rule 9(c) calls for a denial, this Court has excused technical noncompliance with pleading requirements where the substance of the pleading is sufficient. See id. at 1348-49 n.9; EEOC v. Klingler Elec. Corp., 636 F.2d 104, 107 (5th Cir. 1981). Here, the Answer gave Myers ample notice that defendants believed that she had failed to timely file a complaint with the EEOC. This notice served to discharge defendants' duty under Rule 9(c) and successfully shifted the burden of going forward back to Myers to present evidence of timeliness. This she did not do.

Moreover, the district court did not abuse its considerable discretion in preventing Myers from putting on evidence of timeliness during rebuttal. "The trial judge has the authority, within limits, to control the scope of rebuttal testimony." United States v. Renfro, 620 F.2d 497, 502 (5th Cir. 1980) (citing Geders v. United States, 425 U.S. 80, 86 (1976)). Here, Myers offered no evidence of timeliness during her case-in-chief, and the defendants did not mount evidence on the issue during their case. The evidence of timeliness that Myers attempted to introduce on rebuttal, therefore, could not "explain, repel, counteract, [n]or disprove" the testimony offered by defense witnesses, cf. United States v. Mock, 523 F.3d 1299, 1303 (11th Cir. 2008) (quoting United States v. Frazier, 387 F.3d

49

1244, 1269 (11th Cir. 2004) (en banc)); there was no evidence to rebut.

## VI.  Prevailing Party Status

While under Florida law, attorney's fees were not available to Myers on the state law battery count, see United Svcs. Auto. Ass'n v. Kiibler, 364 So. 2d 57, 58 (Fla. Dist. Ct. App. 1978), Title VII provides that "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee . . . ."  42 U.S.C. § 2000e-5(k); see also Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 414 (1978).

> Determining when a party prevails is a complex question:
>
> If the plaintiff has succeeded on any significant issue in litigation which achieve[d] some of the benefit the parties sought in bringing suit, the plaintiff has crossed the threshold to a fee award of some kind . . . . The touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties in a manner which Congress sought to promote in the fee statute.

Walker v. Anderson Elec. Connectors, 944 F.2d 841, 846 (11th Cir. 1991) (quoting Tex. Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782, 791-93 (1989)) (alterations in original) (quotation marks omitted).  The "moral satisfaction" that accompanies a judicial determination that one has been aggrieved is insufficient to establish prevailing party status.  See Walker, 944 F.2d at 847 (quoting Hewitt v. Helms, 482 U.S. 755, 762 (1987)).  Rather, the prevailing party must have settled "some dispute which affects the behavior of the defendant towards the plaintiff," Farrar v. Hobby, 506 U.S. 103, 110 (1992) (quoting Hewitt, 482 U.S. at 761)

50

(quotation marks omitted), and the judgment must be "enforceable," id. at 111. Ultimately, "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." Id. at 111-12; see also Taylor v. Sterrett, 640 F.2d 663, 669 (5th Cir. 1981) ("[T]he proper focus is whether the plaintiff has been successful on the central issue as exhibited by the fact that he has acquired the primary relief sought.").

In Walker v. Anderson Electrical Connectors, 944 F.2d 841 (11th Cir. 1991), the plaintiff alleged a violation of Title VII and two accompanying violations of state tort law, namely invasion of privacy and outrage. See id. at 842. The jury determined that the defendant had sexually harassed the plaintiff, and committed the state torts, but awarded nothing in damages on either claim. See id. at 843. The jury found that the harassment had not resulted in damages. See id. We determined that Walker was not a prevailing party under Title VII, "hold[ing] that to be a prevailing party for purposes of 42 U.S.C. § 2000e-5(k), requires the attainment of something more tangible than a jury finding of sexual harassment." Id. at 847. Yet this broad holding does not reach this case, where Myers did attain something more tangible than a jury finding of sexual harassment -- namely, a $610,469.84 award on her battery claim.

51

The Second Circuit, however, has encountered a case that is squarely on point. In Bonner v. Guccione, 178 F.3d 581 (2d Cir. 1999), the plaintiff asserted, among other things, sexual harassment claims under Title VII and the New York Human Rights Law. The jury found that the plaintiff had been sexually harassed, that damage had occurred within the applicable state time-frame, but that none had occurred during the applicable federal time-frame. Id. at 583. She therefore recovered $90,000 on the state claim, but nothing on the federal claim. Id. The court determined ultimately that the plaintiff was not a prevailing party under Title VII, reasoning that there was simply nothing to enforce: "Plaintiff here failed to obtain either an enforceable judgment or settlement agreement against the defendants on her Title VII cause of action." Id. at 594.

The analysis of the Second Circuit is persuasive. The jury's determination that CFI and Siegel subjected Myers to sexual harassment, but that recovery was time-barred, does nothing to advance the legal rights asserted by Myers against the defendants. Based on the judgment rendered, the defendants need not curtail their behavior nor pay Myers money, cf. Farrar, 506 U.S. at 111-12, and the legal relationship between the parties has not been altered. Cf. Walker, 944 F.2d at 846. Moreover, on the Title VII count, judgment was even entered in favor of the defendants. Cf. Bonner, 178 F.3d at 599 ("[T]he jury found that the Title VII

52

claim for damages (the only relief sought) was time-barred. If the jury had returned a special verdict containing such an express finding, the defendants would have been entitled to the entry of a judgment in their favor."). In short, Myers is not a prevailing party on the Title VII claim and is not entitled to attorney's fees.[10]

## VII. Reinstatement of Other State Law Claims

As a final matter, Myers asks us to instruct the district court to reinstate a variety of state law claims that were dismissed in April of 2005. While we agree that federal district courts in removal cases must remand, rather than dismiss, state claims over which they decline to exercise supplemental jurisdiction, see Cook v. Sheriff of Monroe County, 402 F.3d 1092, 1123 (11th Cir. 2005); Lewis v. City of St. Petersburg, 260 F.3d 1260, 1267 (11th Cir. 2001), Myers neglected to raise this issue when this case first came before this Court. Nearly five years have passed since these claims were dismissed, and we decline now to upset the decision of a lower court that should have been challenged before us more than two and a half years ago. Cf. Nationalist Movement v. City of Cumming, Ga., 92 F.3d 1135, 1138-39 (11th Cir. 1996); Caban-Wheeler v. Elsea, 71 F.3d 837, 842 (11th Cir.

---

[10] Victory on the battery charge played no causal role in the decision of the district court not to award attorney's fees on the Title VII charge. If, however, the trial court had declined to award fees under Title VII on account of an award of fees on a related matter, our analysis would be different. Cf. Bridges v. Eastman Kodak Co., 102 F.3d 56, 58 (2d Cir. 1996); Hall v. W. Prod. Co., 988 F.2d 1050 (10th Cir. 1993).

53

1996); <u>Martin v. Atlantic Coast Line R.R. Co.</u>, 289 F.2d 414, 416 (5th Cir. 1961).

Accordingly, the judgment of the district court is AFFIRMED.

**AFFIRMED**.